## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| RODRIGO LIZAMA GUTIERREZ, VICTOR QUINTANILLA GALLEGOS, ENRIQUE PALOMARES REYES, and RAFAEL ESCOBAR GARCIA. | ) ) ) ) ) |  |
| *Petitioner-Plaintiff* | ) ) |  |
| v. | ) ) |  |
| RUSSELL HOTT, *in his official capacity as the Washington Field Office Director of Immigration and Customs Enforcement;* JEFFREY CRAWFORD, *in his official capacity as Director of the ICA-Farmville Detention Center;* CHAD F. WOLF, *in his official capacity Acting Secretary of Homeland Security;* MATTHEW T. ALBENCE, *in his official capacity as Acting Director of Immigration and Customs Enforcement;* U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; WILLIAM P. BARR, *in his official capacity as Attorney General of the United States;* JAMES MCHENRY, *in his official capacity as Director of the Executive Office for Immigration Review*; DAVID H. WETMORE, *in his official capacity as Chairman of the Board of Immigration Appeals*; BOARD OF IMMIGRATION APPEALS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **PETITION FOR WRIT OF HABEAS CORPUS AND MANDAMUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>Civ. No.: 1:20-cv-712-LMB-IDD |
| *Respondents-Defendants.* | ) ) |  |

1

**INTRODUCTION**

1.      This case presents a request for immediate relief on behalf of four Petitioners-Plaintiffs ("Plaintiffs") held in the custody of U.S. Immigration and Customs Enforcement ("ICE") who seek immediate release under the Fifth Amendment: Rodrigo Lizama Gutierrez, Victor Quintanilla Gallegos, Enrique Palomares Reyes, and Rafael Escobar Garcia.

2.      Plaintiffs Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos respectfully petition for a writ of habeas corpus to remedy their unlawful prolonged detention by Respondents-Defendants ("Defendants."). The detention of Mr. Lizama Gutierrez, who has been detained for 22 months and counting, and Mr. Quintanilla Gallegos, a long-time Lawful Permanent Resident of over 40 years who has been detained for approximately 14 months, have become unconstitutional. Their claims are substantially similar to those put forward by the Plaintiff in *Portillo v. Hott*, 322 F. Supp. 3d 698 (E.D. Va. 2018). They seeks immediate relief on that basis or, in the alternative, relief in the form of a bond hearing with the burden of proof on the government to justify continued detention by clear and convincing evidence, and with a requirement that the government consider alternatives to detention and their ability to pay bond. *See, e.g., id.* at 707. Mr. Lizama Gutierrez further petitions for a writ of mandamus to compel the Board of Immigration Appeals ("BIA") to undertake unlawfully withheld and unreasonably delayed action regarding his Motion to Reconsider ("MTR") which has been pending for nearly 11 months.

3.      The situation at Farmville Detention Center in Farmville, Virginia, a facility controlled and operated by the company Immigration Centers of America where Respondent-Defendants ("Defendants") detain Plaintiffs, has worsened significantly over the past week. Currently, there is an active COVID-19 outbreak at Farmville with at least 50 confirmed positive

COVID-19 cases.[1] On information and belief, numerous people across several dormitories at Farmville currently have COVID-19 symptoms including serious coughs, fevers, difficulty breathing, chest pain, and diarrhea. Defendants have failed to test individuals with serious COVID-19 symptoms for several days, including someone who had a 105-degree fever, was given only two Tylenol pills, and told nothing more can be done for him. Provision of personal protective equipment (PPE) is inadequate. While Defendants issued detained individuals masks several weeks ago, they have not provided replacement masks or provided detained individuals a way to wash or sterilize their masks. Plaintiffs have no meaningful ability to socially distance: they live in close quarters and sleep in adjacent bunkbeds no more than a few feet apart and in dormitories with up to 85 people in each. Farmville continues to accept mass groups of individuals transferred from out of state, including from facilities in Arizona and Florida with active COVID-19 outbreaks.

4.      Plaintiffs, who are all medically vulnerable, face a serious and imminent threat of serious illness or death should they contract COVID-19.

5.      This substantial risk of serious illness or death violates all Plaintiffs' Fifth Amendment right to be free from unlawful punishment.

6.      This substantial risk of serious illness or death further aggravates the harm Plaintiffs Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos are experiencing because of their prolonged detention of approximately 22 and 14 months respectively, and they are entitled to release from custody or, in the alternative, to an individualized bond hearing, at which the government must bear the burden of establishing by clear and convincing evidence that each of them presents a risk of flight or danger after consideration of alternatives to detention that could

---

[1] U.S. Immigration and Customs Enforcement, ICE Guidance on COVID-19 (accessed Jun. 26, 2020), https://www.ice.gov/coronavirus.

mitigate any risk that their release would present and taking into account their financial ability to pay bond. If the government cannot meet its burden, it should release each of them immediately on appropriate conditions of supervision.

7.      Mr. Lizama Gutierrez further respectfully requests that the Court issue a writ of mandamus compelling the BIA to act on his 11 month-pending MTR. On July 26, 2019, the BIA erroneously dismissed Mr. Lizama Gutierrez's Notice of Appeal as untimely based on the agency's clerical mistake regarding the date of the mailing of Plaintiff's notice of appeal of the immigration judge's order of removal. On August 7, 2019, Mr. Lizama Gutierrez's immigration appellate counsel timely filed a MTR. Since that time, Mr. Lizama Gutierrez through immigration counsel has made several inquiries and filed a Motion to Expedite adjudication of the MTR with the BIA but the BIA has taken no action for 11 out of the 22 months he has been in detention. The BIA's continuing and unjustified delay of action is an unlawful withholding and an unreasonable delay that violates the Administrative Procedures Act.

8.      Plaintiffs are languishing in detention during a global pandemic. They are highly vulnerable to serious illness or death if they contract COVID-19, for which there is no known vaccine, treatment, or cure. As set forth below, the danger posed by Plaintiffs' detention during the COVID-19 pandemic is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk" and violates their constitutional right to safety in government custody. *Helling v. McKinney,* 509 U.S. 25, 36 (1993). Plaintiffs' continued detention also violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, because Defendants are failing to provide appropriate accommodations for their disabilities.

## JURISDICTION & VENUE

9.      This action arises under the Due Process Clauses of the Fifth Amendment to the United States Constitution, the Immigration and Nationality Act, the Administrative Procedures Act, 5 U.S.C. § 702, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 (waiver of sovereign immunity and review of agency action), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201-02 (declaratory relief), U.S. CONST. art. 1, § 9, cl. 2 (Suspension Clause), as Mr. Lizama Gutierrez is presently in custody under or by color of the authority of the United States, and Mr. Lizama Gutierrez challenges his custody as a violation of the Constitution, laws, and/or treaties of the United States.

11.     The federal district courts have subject matter jurisdiction under both 28 U.S.C. § 1331 and 28 U.S.C. § 1361 to hear mandamus claims by individuals challenging the lawfulness of agency inaction by the Board of Appeals. Additionally, the Administrative Procedures Act, 5 U.S.C. § 702, waives sovereign immunity in suits against the government for injunctive relief.

12.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 2241(d) and pursuant to 28 U.S.C. § 1391(b) and (e).

## THE PARTIES

13.     Plaintiff Rodrigo Lizama Gutierrez is a noncitizen who is currently detained by ICE at Farmville pending the outcome of his appeal to the BIA challenging his removal order, which the Board stayed on May 7, 2019. In addition to having been deemed incompetent by an Immigration Judge during his removal proceedings based on his mental health status and disabilities, Mr. Lizama Gutierrez suffers from frequent and recurring chronic respiratory

infections. He is therefore at high risk of severe illness or death if he contracts COVID-19. If

released, he will reside at 2823 South Glebe Road, Arlington, VA 22206, where he can

quarantine and socially isolate with his mother, Mirna Gutierrez. His family friend, Edmund

Baker, will pick him up and drive him to his mother's house and assist with any medical

appointments should they be needed so that Mr. Lizama Gutierrez can avoid the use of public

transportation.

14.     Plaintiff Victor Quintanilla Gallegos is a 51-year-old native and citizen of Mexico

and Lawful Permanent Resident of this country for over 40 years. He is currently detained by

ICE at Farmville Detention Center. Mr. Quintanilla Gallegos suffers from coronary artery

disease, hypertension, hyperlipidemia, Hepatitis A, Hepatitis C, and arthrosis. The CDC has

identified nearly all of these pre-existing conditions as high-risk factors for COVID-19.[2] Mr.

Quintanilla Gallegos is at high risk of severe illness or death if he contracts this disease. If

released, he will live with his mother Emma Quintanilla at 11151 Voyager Cove, El Paso, TX

79936.

15.     Plaintiff Enrique Palomares Reyes is a 52-year-old native and citizen of Mexico,

who is currently detained by ICE at Farmville Detention Center. He suffers from ventral hernia;

bilateral inguinal hernia; cavernous hemangioma of liver; abdominal hernia; and acute

abdominal pain. Due to his age and medical conditions, he is at high risk of severe illness or

death if he contracts COVID-19. If released, he will reside with his wife Sandra Luz Morales and

his son José Morales at 348 East King Street, Strasburg, VA 22657.

16.     Plaintiff Rafael Escobar Garcia ("Mr. Escobar Garcia") is 61-year-old native and

citizen of Guatemala, who is currently detained by ICE at the Farmville Detention Center. Due to

---

[2] Centers for Disease Control and Prevention, *People Who Are at Higher Risk* (June 23, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

his age, he is at high risk of severe illness or death if he contracts COVID-19. If released, he will reside at the home of a family friend, Toribio Martinez, who resides at 2432 Wabash Avenue, Los Angeles, CA 90033, with his partner, Rosa, and her daughter, Brenda, who currently reside there.

17.     Defendant Russell Hott is the Field Office Director of the Washington Field Office of ICE, and as such is the federal agent charged with overseeing all ICE detention centers in Virginia including Farmville Detention Center. Defendant Hott is a legal custodian of Plaintiff. Mr. Hott is sued in his official capacity.

18.     Defendant Jeffery Crawford is the Director of the Farmville Detention Center, which is owned and operated by ICA-Farmville, and is the facility at which Defendants have detained Plaintiff. Defendant Crawford is responsible for overseeing the administration and management of the Farmville Detention Center. Accordingly, Defendant Crawford is the immediate custodian of the Plaintiff. He is sued in his official capacity.

19.     Defendant Chad F. Wolf is the Acting Secretary of Department of Homeland Security, the arm of the U.S. government responsible for administration and enforcement of immigration laws. He has supervisory responsibility for and authority over the detention and removal of noncitizens throughout the United States. ICE is a subdivision of the Department of Homeland Security ("DHS"). Mr. Wolf is the ultimate legal custodian of the Plaintiff. Mr. Wolf is sued in his official capacity.

20.     Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. In this capacity, he is responsible for the enforcement of immigration laws and for ICE's policies, practices, and procedures. He has authority over the

detention and removal of noncitizens throughout the United States. As such, he is a legal custodian of the Plaintiff. Mr. Albence is sued in his official capacity.

21.     Defendant ICE is a federal law enforcement agency within DHS. ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. The Enforcement and Removal Operations ("ERO") is a division of ICE, which manages and oversees the immigration detention system. Defendant ICE is a legal custodian of Plaintiff.

22.     Defendant William P. Barr is the Attorney General of the United States. As Attorney General, Mr. Barr oversees the immigration court system, including the BIA and its board members, which review appeals from immigration courts as his designee, and the immigration judges who conduct bond hearings as his designees. He is sued in his official capacity.

23.     Defendant James McHenry is the Director of the Executive Office for Immigration Review ("EOIR"). As Director, Mr. McHenry directly oversees the immigration court system and its immigration judges, including the Board of Immigration Appeals and its board members. He is sued in his official capacity.

24.     Defendant David H. Wetmore is the Chairman of the Board of Immigration Appeals. As Chairman, he oversees the BIA, which is directly responsible for adjudicating appeals, including reviewing and adjudicating appeals and motions to reconsider filed with the Board. He is sued in his official capacity.

25.     Defendant, the BIA is an agency within the Executive Office for Immigration Review that is responsible for reviewing decisions of the Immigration Courts, and as such is

responsible for reviewing Plaintiff's appeal and subsequent Motion to Reconsider. Defendant

BIA is sued in its official capacity.

## FACTS

### A.  Mr. Lizama Gutierrez's Immigration and Procedural History.

26.      Mr. Lizama Gutierrez is a native and citizen of El Salvador. He first entered the

United States as an unaccompanied minor, without inspection on or around August 21, 2014. He

fled El Salvador after the MS-13 gang tried to recruit him multiple times and, when he refused

each time, attacked him and threatened to kill him and his family.

27.      The first time he was attacked, four members of MS-13 approached Mr. Lizama

Gutierrez as he was on his way to school. The gang members attempted to recruit Mr. Lizama

Gutierrez but he refused to join, and in response the gang called him homophobic slurs and

began to beat him, punching and kicking him and hitting him with a baseball bat in the stomach,

back, and head. The gang then threatened to kill him and his family the next time they saw him,

and told him that he would be killed if he went to the police. For that reason, he did not report

the incident to officials. A few months later, MS-13 again tried to recruit Mr. Lizama Gutierrez

and again he refused and was beaten. He fled El Salvador approximately a month later, arriving

to the United States as an unaccompanied minor at the age of 15.

28.      Following his entry to the United States in 2014, Mr. Lizama Gutierrez was

served with a Notice to Appear for Removal Proceedings ("NTA") and released.

29.      Shortly after his arrival, Mr. Lizama Gutierrez's mother and brother also migrated

to the United States, and the three have lived as a family unit in Alexandria, Virginia up until Mr.

Lizama Gutierrez's detention by ICE. Prior to his detention, his family relied on him for

financial support, and as the eldest brother in a single-parent home, he was an important figure

for the family. Mr. Lizama Gutierrez was a role model for his younger brother, and would often babysit his young niece, who lived about five minutes away. Since Mr. Lizama's detention and the loss of his financial support, his family has lost their home.

30.     As part of his initial immigration case in 2014, Mr. Lizama Gutierrez, then an unaccompanied minor, sought relief by applying for Special Immigrant Juvenile Visa (SIJS). Accordingly, on March 26, 2018, the Immigration Court granted Mr. Lizama Gutierrez's unopposed motion to terminate proceedings so that he could apply for Adjustment of Status with USCIS.

31.     On or around August 7, 2018, ICE took Mr. Lizama Gutierrez into custody at the Farmville Detention Center. ICE thereafter sought to reopen and move forward with Mr. Lizama Gutierrez's initial removal proceedings before the Arlington Immigration Court as a result of his detention.

32.     Mr. Lizama Gutierrez's detention and removal proceedings initiated by ICE in 2018 stem from a single conviction for possession of marijuana (VA. Code § 18.2-250.1), for which he possessed a single marijuana cigarette under less than 30 grams, was sentenced to pay a $100 fine, and received suspension of his driver's license for six months. This conviction not only subjected him to mandatory (no-bond) immigration detention,[3] but also made him ineligible to adjust his status as a special immigrant juvenile minor because he did not qualify for a waiver of this minor offense under the immigration statute as he does not have any qualifying members who are U.S. citizens or lawful permanent residents.[4]

---

[3] An offense such as this makes an immigrant inadmissible under 8 U.S.C. § 1182(a)(2)(A)(i)(II), and unlike the deportability removability ground under 8 U.S.C. § 1227(a)(2)(B)(i) it does not provide for an exception to removability if the offense involves less than 30 grams of marijuana.

[4] The statute provides for a waiver of inadmissibility for offenses described in 8 U.S.C. § 1182(a)(2) under 8 U.S.C. § 1182(h), but this waiver is conditional upon demonstrating extreme hardship to a spouse, parent, son, or daughter who is a U.S. citizen or who has been lawfully admitted for permanent residence.  8 U.S.C. § 1182(h)(1)(B)

33.     Mr. Lizama Gutierrez has two other convictions: a conviction for destruction of property (VA. CODE § 18.2-137), stemming from an incident in 2017 where he accidentally broke a door for which he received no jail time and was sentenced to pay a $100 fine; and a conviction for trespassing (VA. CODE § 13.1-33), when he was cited for trespassing at an apartment complex where he was visiting a friend and for which he was sentenced to pay a $100 fine and six months' probation. For none of his three convictions was Mr. Lizama Gutierrez sentenced to any jail time.

34.     During his removal proceedings in 2018, Mr. Lizama Gutierrez appeared *pro se* at two preliminary hearings, one on September 20, 2018, and another held on November 1, 2018. At this second hearing, the Immigration Judge noted on the record that she was concerned that Mr. Lizama Gutierrez appeared to have mental health issues and so scheduled him for a competency hearing. On January 17, 2019, the Immigration Judge conducted a competency hearing and found Mr. Lizama Gutierrez to be mentally incompetent ordering he be appointed legal counsel for his removal proceedings through the EOIR's National Qualified Representative Program.

35.     On or around February 13, 2019, Ms. Eileen Blessinger entered her appearance in the Arlington Immigration Court as Mr. Lizama Gutierrez's immigration attorney and Qualified Representative. She represented him at a subsequent Master Hearing on March 7, 2019 and an Individual Hearing on the merits on April 1, 2019, in which he applied for asylum, withholding of removal, and protection under the Convention Against Torture. Following his merits hearing, Immigration Judge ("IJ") Farrar-Crocket issued a written decision denying his applications for relief despite finding Mr. Lizama Gutierrez had testified credibly, had a subjective fear of returning to his country, and in fact had experienced past harm at the hands of the MS-13 gang. Ex. A. The

IJ's decision was mailed to the parties on May 8, 2019, and indicated that "any Notice of Appeal should be served on the Board of Immigration Appeals (hereinafter "BIA") within 30 calendar days after the date of mailing." *Id.* at 14.

36.     On June 7, 2019, Mr. Lizama Gutierrez, through appellate counsel Mr. Ben Winograd, timely filed a Form EOIR-26 Notice of Appeal with the BIA. The BIA acknowledged its receipt of the Notice on June 7. Ex. B. On July 26, 2019, nevertheless, the BIA dismissed Mr. Lizama Gutierrez's appeal as untimely based upon a mistaken belief that the decision had been mailed on May 7, which was the date when the decision was *issued*, rather than May 8, when the decision was actually *mailed*. On August 7, 2019, appellate counsel timely filed a Motion to Reconsider (hereinafter "MTR") with a copy of the BIA's opinion dismissing the matter, and the postmarked envelope from the Immigration Court showing the Immigration Judge's decision had been mailed on May 8, 2020. Ex. C. On August 23, 2020, appellate counsel filed a Stay of Removal with the Board, which was granted on August 26, 2020. Ex.  D. From August 2019 to the present, Mr. Lizama Gutierrez has remained detained while his MTR with the BIA is pending. The BIA has taken no action on this motion.

37.     On January 16, 2020, DHS joined Mr. Lizama Gutierrez in filing a Motion to Expedite the Ruling on his MTR. On February 12, 2020, appellate counsel Mr. Winograd was replaced by present appellate counsel, CAIR Coalition Senior Attorney and Qualified Representative, Mr. Mark Feldman. Since February of 2020, Mr. Feldman has regularly followed up with the BIA requesting a decision on the MTR, but has been informed that there are no statutory deadlines that compel the agency to decide the motion. Ex. H, Declaration of Mark Feldman.

38.     As of the undersigned date, Mr. Lizama Gutierrez's MTR on his dismissed appeal has been pending with the BIA for nearly 11 months, with no action taken. He remains detained at government expense and without an independent hearing to determine the necessity or legality of his prolonged detention. Mr. Lizama Gutierrez has deep remorse for his criminal actions. Mr. Lizama Gutierrez, having now spent over 10 percent of his life and formative years in ICE custody for a criminal offense where he received no jail time, prays for relief from indefinite detention.

**B.  Mr. Victor Quintanilla Gallegos's Immigration and Procedural History.**

39.     Mr. Quintanilla Gallegos is a native and citizen of Mexico. He has resided in the U.S. since first entering as a Lawful Permanent Resident when he was a child over 40 years ago in 1979.

40.     In approximately 2006, an immigration judge granted Mr. Quintanilla Gallegos cancellation of removal for certain lawful permanent residents, maintaining his status as a Lawful Permanent Resident. In approximately 2011, an immigration judge administratively closed his removal proceedings. In approximately May 2018, ICE moved to reopen his removal proceedings based on a 2016 constitutionally infirm New Mexico conviction in which his counsel rendered ineffective assistance of counsel and did not advise of the immigration consequences in violation of *Padilla v. Kentucky*, 559 U.S. 356 (2010). ICE detained Mr. Quintanilla Gallegos in Texas for approximately a year and then transferred him to Farmville in the spring of 2019. He has been subject to mandatory detention throughout his approximately two years of detention.

41.     Based on indicia of incompetency, in August 2019 an immigration judge deemed Mr. Quintanilla Gallegos incompetent pursuant to *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA

2011) and appointed him an attorney under the National Qualified Representative Program in September 2019. With access to counsel, Mr. Quintana Gallegos has since been pursuing his due process right to relief in maintaining his long-time Lawful Permanent Resident status through a viable post-conviction relief claim of his 2018 New Mexico conviction under *Padilla*. The claim is based on his former defense attorney's failure to advise him of immigration consequences and the failure of the criminal judge to determine if the plea was entered into knowingly and voluntarily. Mr. Quintana Gallegos has local counsel in New Mexico for this matter.

### C. Plaintiffs' Risk of Harm from COVID-19.

42.     COVID-19 is a highly contagious coronavirus disease that that has reached pandemic status. As of June 22, 2020, over 8.86 million individuals worldwide have confirmed diagnoses, including more than 2.24 million in the United States.[5] Nearly 466,000 individuals worldwide have died as a result of COVID-19, including at least 119,000 in the United States.[6] Those numbers are growing exponentially, with more than 152,000 new cases worldwide in the past day alone.[7]

43.     Nationally, CDC projections indicate that over 200 million individuals in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention, with as many as 1.7 million deaths in the worst projections.[8]

---

[5] Coronavirus disease 2019 (COVID-19) Situation Report – 154, World Health Organization (June 22, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200622-covid-19-sitrep-154.pdf?sfvrsn=d0249d8d_2.

[6] *Id.*

[7] *Id.*

[8] James Glanz, et al., *Coronavirus Could Overwhelm U.S. without Urgent Action, Estimates Say,* New York Times (Mar. 20, 2020), *available at* https://www.nytimes.com/interactive/2020/03/20/us/coronavirus-model-us-outbreak.html; Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, N.Y. Times, Mar. 13, 2020, *available at* https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html.

Dr. Anthony Fauci, the nation's leading infectious disease expert, has called COVID-19 his "worst nightmare" and warns that it is far from over.[9]

44.      COVID-19 is easily transmitted through respiratory droplets, especially when one is within six feet of an infected individual, and in some cases when one is within 27 feet.[10] Its symptoms include fever, cough, and shortness of breath.[11]

45.      People can also spread COVID-19 but be asymptomatic,[12] making testing or seclusion of only those who are exhibiting symptoms an ineffective solution.

46.      COVID-19 can result in respiratory failure, kidney failure, and death. Infected individuals who do not die from the disease can face serious damage to the lungs, heart, liver, or other organs, resulting in prolonged recovery periods, including extensive rehabilitation from neurological damage and loss of respiratory capacity.

47.      COVID-19 can also severely damage lung tissue, affect cardiac functions, and cause widespread damage to other organs. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

48.      Older individuals and those with certain medical conditions face greater chances of serious illness or death from COVID-19. Certain underlying medical conditions increase the risk of serious COVID-19 disease for individuals of any age, including heart disease, lung disease,

---

[9] Denise Grady, *Fauci Warns That the Coronavirus Pandemic is Far From Over*, New York Times (June 9, 2020), *available at* https://www.nytimes.com/2020/06/09/health/fauci-vaccines-coronavirus.html.

[10] Bourouiba, Lydia, Journal of the American Medical Association, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19* (Mar. 26, 2020), *availalble at* https://jamanetwork.com/journals/jama/fullarticle/2763852?appId=scweb

[11] Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19)*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[12] A study in Iceland, where COVID-19 testing is widespread, found that about half those who tested positive have no symptoms. Jason Gale, *Coronavirus Cases Without Symptoms Spur Call for Wider Tests*, Bloomberg (Mar. 22, 2020), *available at* https://www.bloomberg.com/news/articles/2020-03-22/one-third-of-coronavirus-cases-mayshow-no-symptom-scmp-reports.

chronic liver or kidney disease, diabetes, epilepsy, hypertension, compromised immune systems, blood disorders, inherited metabolic disorders, stroke, and pregnancy.

49.     Even younger and healthier individuals who contract COVID-19 may require supportive care. And those who develop serious complications will need advanced support, including highly specialized equipment that is in limited supply and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level of support is especially difficult to provide to detained individuals.

50.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality of people infected with the coronavirus is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.

51.     Patients in high-risk categories who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation.

52.     There is no vaccine against COVID-19, nor is there any known medication to prevent or cure infection from the virus.

53.     The only known effective measure to reduce the risk of severe illness or death to vulnerable individuals is to prevent them from being infected with the coronavirus. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures to prevent infection.

54.     These practices are not possible in Farmville Detention Center, where large numbers of people are housed in close quarters in congregate settings, with minimal access to sinks, showers, toilets, water, personal hygiene and facility cleaning supplies.

**D.  Plaintiffs are Particularly Vulnerable to Serious Illness or Death If Infected by COVID-19 Due to Their Underlying Medical Conditions and Age.**

55.     Individuals with certain medical conditions and older age face dramatically higher chances of serious illness or death from COVID-19. Individuals detained in immigration detention centers, like Plaintiffs, are also more susceptible to experiencing complications from infectious diseases than the population at large. This is especially true for individuals with underlying conditions.

56.     Infectious disease outbreaks such as COVID-19 can also exacerbate existing mental health conditions and can contribute to the development of new mental health conditions.

57.     Plaintiffs in this case are individuals who are particularly vulnerable to serious illness or death if infected by COVID-19 due to their age and/or medical conditions. Plaintiffs are currently detained at Farmville Detention Center, where COVID-19 infection rates are skyrocketing, as they await adjudication of their immigration cases.

58.     **Mr. Lizama Gutierrez** has a history of chronic, frequent and recurring respiratory infections, as well as a likely compromised immune system due to his inability to sleep more than two to three hours per night as a result of his debilitating anxiety and depression. Ex. E, Report of Kate Sugarman, MD, at 3. Additionally, he has been diagnosed with Post-Traumatic Stress Disorder ("PTSD") (ICD-10 Code F43.12), Major Depressive Disorder ("MDD") (ICD-10 Code F32.0), and medically severe Generalized Anxiety Disorder ("GAD") (ICD-10 Code F41.1). Ex. F, Report of Susan Osofsky, MSW, LCSW at 4. Despite the psychiatric care and medication he has received since October 2018, he has attempted suicide three times in ICE detention.

59.     As stated in a psychological evaluation conducted of Mr. Lizama Gutierrez, although he "has been receiving psychiatric care, it does not appear to be helping him as he has decompensated while in detention and continues to do so." Ex. G, Report Rahul P. Vasireddy,

MD, and Shawn S. Sidhu, M.D., FAPA, DFAACAP at 7. He continues to self-harm and experience suicidal ideation, cutting his legs with a razor in the shower and expressing to an officer on at least one occasion that he wishes to die. "If he were to remain in detention," the report notes, "his mental health would likely continue to deteriorate." *Id.* at 6.

60.     Mr. Lizama Guiterrez's pre-existing struggles with mental health and his continued detention are mutually reinforcing, and, as the Psychological Evaluation states, "he is in urgent need of a non-custodial environment and expert mental health care and medication." *Id.* If released, on the other hand, and placed in a safe environment with family members, "his condition is highly likely to stabilize, significantly reducing the risk of suicide." *Id.* at 7.

61.     Due to his medical conditions, he is at high risk of severe illness or death if he contracts COVID-19.

62.     **Mr. Victor Quintanilla Gallegos** is a 51-year-old citizen of Mexico and Lawful Permanent Resident of the United States. He suffers from coronary artery disease, hypertension, hyperlipidemia, Hepatitis A, Hepatitis C, and arthrosis. Due to his medical conditions and age, he is at high risk of severe illness or death if he contracts COVID-19.

63.     **Mr. Enrique Palomares Reyes** is a 52-year-old citizen of Mexico. He suffers from ventral hernia; bilateral inguinal hernia; cavernous hemangioma of liver; abdominal hernia; and acute abdominal pain. Due to his medical conditions and age, he is at high risk of severe illness or death if he contracts COVID-19.

64.     **Mr. Rafael Escobar Garcia** is a 61-year-old citizen of Guatemala. Due to his age, he is at high risk of severe illness or death if he contracts COVID-19.

65.     Plaintiffs' health conditions qualify as disabilities under the Rehabilitation Act.

**E.  Plaintiffs Face an Elevated Risk of Contracting COVID-19 Because They Are Detained at Farmville Detention Center.**

66.     There is an active COVID-19 outbreak at Farmville Detention Center with approximately 70 individuals or more reporting symptoms. Confirmed COVID-19 cases reported by ICE have spiked from two in April to 50 as of June 26, even as testing remains woefully inconsistent and inadequate.[13] COVID-19 is currently spreading uncontrollably in the Farmville Detention Center, which has failed to implement adequate measures to protect detained people against a life-threatening illness.



Rate of COVID-19 Case at Farmville Detention Center

67.     Many people detained in Farmville Detention Center have reported that they and others are exhibiting COVID-19 symptoms, including serious coughs, fevers, difficulty breathing, chest pain, and diarrhea. While some testing is being done, it is not comprehensive,

---

[13] U.S Immigrations and Customs Enforcement, *ICE Detainee Statistics* (accessed June 26, 2020), *available at https://www.ice.gov/coronavirus.*

indicating that the number of cases is likely higher. One individual reported having a 105 degrees fever, being refused a test for several days, being given only two Tylenol, and being told there was nothing else that could be done for him. Several people have reported that a detained individual did not receive medical care for days, collapsed on the floor, was not able to get up, and had to be brought out of the dorm in a wheelchair.

68.     On information and belief, on June 22, 2020, guards at Farmville Detention Center entered a dorm with a flashbang with guns drawn, held at gunpoint approximately 12 detained individuals who were peacefully protesting the lack of medical care, took them away, and fired rubber bullets. The guards then placed these individuals in isolation/segregation. In the following days, the facility forbid people detained in at least two dorms from speaking to any people outside the facility, including lawyers. While some access to phone communications have resumed, people in at least two dorms continue to lack access to private and confidential phone calls with attorneys.

69.     Farmville Detention Center continues to accept mass groups of individuals transferred from out of state, including over 70 people from facilities in Arizona and Florida with active COVID-19 outbreaks. In an e-mail communication, Defendant Crawford confirmed that individuals who have been transferred have since tested positive for COVID-19. While the facility claims to quarantine new arrivals in a separate dorm, individuals held in the general population have tested positive for COVID-19 following transfers of detained individuals into Farmville, calling into question the facility's ability to enforce an effective quarantine. Moreover, people held in different dorms are indirectly exposed to one another due to constant movement of individuals within the facility: guards and facility staff go in and out of the dorms and detained individuals come into contact with individuals from other dorms when they visit the

medical unit or perform labor, such as kitchen duties.  On June 26, 2020, in response to the spike of more than 50 positive cases at Farmville that resulted from transfers, Senator Kaine and Senator Warden sent a letter calling on ICE to stop transferring people amid the COVID-19 crisis. have Ex. I.

70.     Several dorms in the facility have been and currently are under quarantine.[14] Individuals exhibiting symptoms are held in the same dorms as individuals with no symptoms. According to reports emerging from the facilities, individuals experiencing serious coughs have been brought to the medical unit and then placed back in their dorms without quarantine.

71.     Several people who are detained and have chronic conditions and/or serious mental health issues are not receiving medical treatment or medications.

72.     There is an absence of personal protective equipment. Individuals have only received one mask, with no replacements. Some people have requested new masks and been denied. Guards are selectively wearing masks at the facility.

73.     The design and placement of people detained at Farmville Detention Center make it impossible to mitigate the rapid exposure and spread of the current COVID-19 outbreak to the medically vulnerable Plaintiffs. Persons detained at Farmville are housed together in groups, typically 40 to 85 people in each dorm. Because the dormitories house many individuals in close quarters with people sharing bunk beds, maintaining the CDC recommended distance of six feet apart from others is impossible.

74.     There are communal living spaces in the middle of each housing unit, which have essential spaces like areas to use phones and showers.

_____

[14] *See, e.g.*, Marissa J. Lang, '*It's a Time Bomb': ICE Detainees Seek Release Amid Growing Coronavirus Fears*, Washington Post (Apr. 8, 2020), *available at* https://www.washingtonpost.com/local/ice-coronavirus-detention-centers-release/2020/04/08/f4dcaef8-74ee-11ea-87da-77a8136c1a6d_story.html.

75.     There are also several shared spaces in Farmville Detention Center, including sitting areas for meals, hallways, the law library, visitation areas, and medical units.

76.     The hallways are tight, and people in the hallways are constantly in very close proximity to each other. Bathrooms are used by large numbers of people and are not sanitized or disinfected regularly.

77.     It is nearly impossible to eliminate all shared spaces in the facility and to ensure that individuals are maintaining adequate distance from one another.

78.     Farmville Detention Center has failed to put measures in place to prevent infected individuals who are asymptomatic from spreading the virus within the facility. Facility staff, who arrive and leave on a shift basis, receive temperature checks but are not tested for COVID-19. Similarly, new transfers, including individuals transferred to Farmville from COVID-19 hot spots, are not tested upon arrival. Screening measures that do not include testing for COVID-19 do little to prevent asymptomatic spread.

79.     Farmville Detention Center is also ill-equipped to manage an infectious disease outbreak.[15] It has very limited on-site medical facilities, which include a small number of medical and disciplinary isolation units.

80.     Nationwide, COVID-19 outbreaks have wreaked havoc in ICE detention centers and two individuals in ICE custody have died from the virus.[16]

---

[15] Last year, Farmville Detention Center had an outbreak of mumps in its facility with at least 24 people infected.[15] The facility mismanaged the handling of that outbreak in several respects. Despite mumps being an illness for which there is a vaccine, detained individuals were refused vaccines when they were requested. The entire detention center was eventually placed under quarantine even though the outbreak was limited to a few dorms. *See* Emma Ockerman, *Migrant Detention Centers Are Getting Slammed with Mumps and Chickenpox*, Vice News (Jun. 14, 2019), *available at* https://www.vice.com/en_us/article/mb8k5q/migrant-detention-centers-are-getting-slammed-with-mumps-and-chicken-pox.

[16] *See e.g.,* Ryan Devereaux, *ICE Detainee Who Died of COVID-19 Suffered Horrifying Neglect*, The Intercept (May 24, 2020), *available at* https://theintercept.com/2020/05/24/ice-detention-coronavirus-death/ (one death and 155 confirmed cases at Otay Mesa Detention Center); Lisa Hagen, *ICE Detainee Dies in Georgia After Testing Positive for COVID-19*, WABE (May 25, 2020) *available at* https://www.wabe.org/ice-detainee-dies-after-

81.     Confirmed cases at Eloy Detention Center in Arizona recently jumped from a few dozen to 122 cases in a matter of days.[17] The total number of confirmed cases there has now reached 217.[18] In Bluebonnet Detention Center in Texas, 253 individuals have tested positive for COVID-19.[19] ICE's practice of transferring detained individuals between facilities has fueled outbreaks throughout the country.[20] Similar to the outbreaks at other immigration detention facilities, conditions at Farmville Detention Facility are quickly deteriorating, placing the lives of high-risk individuals in jeopardy.

### F.  ICE's Response to COVID-19 Is Insufficient to Prevent the Spread of This Life-Threatening Disease.

82.     Detained individuals are inherently vulnerable to contracting COVID-19 because they cannot socially distance. They spend their entire day and night within close proximity to others. The measures ICE has taken to mitigate the unique risk COVID-19 poses to detained populations is been woefully inadequate.

83.     ICE's official guidance on COVID-19 does not state specifically under what conditions individuals detained would be tested, and ICE has only tested a third of its detained population so far.[21]

---

testing-positivefor-covid-19-in-georgia/ (one death and 16 confirmed cases at Stewart Detention Facility). Camilo Montoya-Galvez, *Second Immigrant Dies of Coronavirus Complications While in ICE Custody*, CBS News (May 25, 2020), *available at* https://www.cbsnews.com/news/second-immigrant-dies-ofcoronaviruscomplications-while-in-ice-custody/ (last accessed May 26, 2020).

[17] Daniel Gonzalez, Guard at Eloy Detention Center May Have Died of COVID-19 as Coronavirus Cses at Facility Soar, Arizona Republic (Jun. 15, 2020), available at
https://www.azcentral.com/story/news/politics/immigration/2020/06/15/coronavirus-cases-arizona-eloy-detention-center-guard-covid-19-deaths/3193118001/.

[18] U.S. Immigration and Customs Enforcement, ICE Guidance on COVID-19 (accessed Jun. 26, 2020), https://www.ice.gov/coronavirus.

[19] *Id.*

[20] Lisa Riordan Seville and Hannah Rappleye, *ICE Keeps Transferring Detainees Around the Country, Leading to COVID-19 Outbreaks*, NBC News (May 31, 2020), *available at* https://www.nbcnews.com/politics/immigration/ice-keeps-transferring-detainees-around-country-leading-covid-19-outbreaks-n1212856.

[21] U.S. Immigration and Customs Enforcement, ICE Guidance on COVID-19 (accessed June 23, 2020), https://www.ice.gov/coronavirus.

84.     Instead of widespread testing, ICE relies on screening for symptoms. Since some COVID-19 carriers can be asymptomatic or not show symptoms for weeks after exposure, "screening people based on observable symptoms is just a game of catch up." *In re. Extradition of Alejandro Toledo Manrique,* No. 19-mj-71055, 2020 WL 1307109 (N.D. Cal. March 19, 2020). Without widespread testing, it is impossible for Farmville to prevent new arrivals and staff from bringing the virus into the facility.

85.     Although ICE has temporarily suspended social visitation in all detention facilities, staff, contractors, and vendors continue to arrive and leave the detention centers. In addition, ICE frequently transports people to, from, and between facilities.

86.     The only measure ICE has committed to taking to mitigate any spread in its facilities is to segregate those who meet CDC criteria for epidemiologic risk of exposure to the coronavirus.[22] Even assuming adequate space, isolation of people who are ill is generally an ineffective way to prevent transmission of COVID-19 because air continues to flow outward from rooms to the rest of the facility.

87.     Farmville Detention Center has a very limited number of negative pressure isolation units, meaning that they do not have any capacity to truly isolate spread of the disease through airborne respiratory droplets.

88.     Immigration detention facilities have faced outbreaks of other infectious diseases in recent years due to overcrowding, poor hygiene measures, medical negligence, and poor access to resources and medical care. As recently as last year, ICE mishandled and failed to take adequate measures to protect people detained in Farmville Detention Center against an outbreak

---

[22] *Id.*

of mumps.[23] And ICE has a long history of mishandling infectious and communicable diseases, struggling to contain them, and failing to follow nationally accepted standards. The Office of the Inspector General ("OIG") of DHS even concluded in a 2019 report that ICE "does not adequately hold detention facility contractors accountable for not meeting performance standards," "issued waivers to facilities with deficient conditions, seeking to exempt them from complying with certain standards," and "does not adequately share information about ICE detention contracts with key officials."[24]

89.     Given the rapid spread of COVID-19, the prevalence of asymptomatic spread, limited testing, ICE's repeated failure to meet adequate standards for controlling infectious disease outbreaks in its facilities, and current conditions at Farmville Detention Center, Defendants cannot prevent the further spread of COVID-19 throughout the facility.

### F. Individuals Most Vulnerable to COVID-19 Should Immediately Be Released.

90.     Public health experts with experience in immigration detention and correctional settings have recommended the release of vulnerable individuals from custody, especially those with medical conditions that make them more vulnerable to serious illness or death if they contract COVID-19.[25] Indeed, Virginia has already done so in its state facilities.[26]

---

[23] Emma Ockerman, *Migrant Detention Centers Are Getting Slammed with Mumps and Chickenpox*, Vice News (Jun. 14, 2019), *available at* https://www.vice.com/en_us/article/mb8k5q/migrant-detention-centers-are-getting-slammed-with-mumps-and-chicken-pox.

[24] *See* Office of Inspector General, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, 1 (Jan. 29, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[25] CDC data shows that of persons whose chronic illness was known, 94% of those who have died had an underlying condition and 78% of those who have required admission to an intensive care unit have had an underlying condition. Joel Achenbach and William Wan, *New CDC Data Shows Danger of Coronavirus for Those With Diabetes, Heart or Lung Disease, Other Chronic Conditions*, Washington Post (Mar. 31, 2020), *available at* https://www.washingtonpost.com/health/new-cdc-data-on-underlying-healthconditions-in-coronavirus-patients-who-need-hospitalization-intensivecare/2020/03/31/0217f8d2-7375-11ea-85cb-8670579b863d_story.html.

[26] Virginia Department of Corrections, *COVID-19 Response Inmate Early Release Plan* (April 2020), *available at* https://vadoc.virginia.gov/media/1506/vadoc-covid19-early-release-plan.pdf.

91.     As early as February 25, 2020, Dr. Scott Allen and Dr. Josiah Rich, medical experts to DHS, shared concerns about the specific risk to immigrant detainees as a result of COVID-19 with the agency. These experts warned of the danger of rapid spread of the coronavirus in immigration detention facilities. In a whistleblower letter to Congress, Dr. Allen and Dr. Rich recommended that "[m]inimally, DHS should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." They concluded that "acting immediately will save lives not of only those detained, but also detention staff and their families, and the community-at-large."

92.     Releasing the most vulnerable people, such as Plaintiffs, would also reduce the burden on regional hospitals and health centers. In case of an outbreak at a detention center, those institutions would bear the brunt of having to treat infected individuals from detention centers and have fewer medical resources available for the general population.

## LEGAL FRAMEWORK

I.    **Due to Their Unconstitutionally Prolonged Detention, Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos are Entitled to Immediate Release or Immediate Bond Hearings Under 8 U.S.C. § 1226(a).**

A.  **The Relevant Detention Statute at Issue for Petitioner Mr. Lizama Gutierrez.**

93.     The BIA issued an order staying Mr. Lizama Gutierrez's removal pending its review of his MTR, and he is therefore detained pursuant to 8 U.S.C. § 1226 rather than 8 U.S.C. § 1231. *Bah v. Barr,* 409 F. Supp. 3d 464, 470 (E.D. Va. 2019); *Guzman Chavez v. Hott,* 940 F.3d 867, 876 (4th Cir. 2019), *cert. granted sub nom. Albence v. Chavez*, 2020 WL 3146678 (2020) (No. 19-897); 8 U.S.C. § 1231(a)(1)(B) ("U.S.C. § 1231's detention provisions are not triggered until the removal period begins, which it will not until, *inter alia*, "any court-issued stay of removal has been lifted. 8 U.S.C. § 1231(a)(1)(B)").

94.     Two provisions of the INA govern the detention of non-citizens pending removal:

8 U.S.C. §§ 1226 and 1231. 8 U.S.C. § 1226 governs detention of individuals "pending a

decision on whether [they are] to be removed from the United States," 8 U.S.C. § 1226(a), while

8 U.S.C. § 1231 governs detention of individuals during and, in some cases, after the "removal

period," *id.* § 1231(a)(1)(A), while they are awaiting removal after exhausting the available legal

avenues to challenge a final removal order.

95.     Detention under 8 U.S.C. § 1226 is generally discretionary. *Jennings,* 138 S. Ct.

at 846. An individual detained under subsection (a) of that statute is immediately eligible to

request release on bond or conditional parole. *See* 8 U.S.C. § 1226(a) ("an alien *may* be arrested

and detained pending a decision on whether the alien is to be removed from the United States,"

the Government "*may* continue to detain the arrested alien" or "may release the alien")

(emphasis added); *see also* 8 C.F.R. § 1236.1(d). Only under special, limited circumstances does

8 U.S.C. § 1226 mandate detention—namely, subsection (c) provides that the Government "shall

take into custody any alien who" has committed certain criminal offenses "when the alien is

released . . . for the same offense," subject to narrow exceptions for participants in the witness

protection program. 8 U.S.C. § 1226(c).

96.     8 U.S.C. § 1231 mandates detention only during the initial 90-day "removal

period," 8 U.S.C. § 1231(a)(1)(A)—the time window during which the Government typically

effectuates an individual's removal. The removal period "begins on the latest of the following:

   i.   The date the order of removal becomes administratively final.
   ii.  ***If the removal order is judicially reviewed and if a court orders a stay of the
        removal of the alien, the date of the court's final order***.
   iii. If the alien is detained or confined (except under an immigration process), the
        date the alien is released from detention or confinement."

*Id.* § 1231(a)(1)(B) (emphasis added).

97.     The removal period may be extended beyond 90 days if the individual "fails or refuses to make timely application in good faith for travel or other documents necessary to [his] departure or conspires or acts to prevent [his] removal." *Id.* § 1231(a)(1)(C). After the initial removal period, detention under 8 U.S.C. § 1231 is no longer mandatory: the Government "may" detain certain "[i]nadmissible or criminal aliens" or individuals determined "to be a risk to the community or unlikely to comply with the order of removal" beyond the removal period. *Id.* § 1231(a)(6).

98.     If and when the BIA reviews the MTR—provided it corrects the date error, and properly enters processes his Notice of Appeal—Mr. Lizama Gutierrez will still be detained under § 1226 pending his appeals process as the order of removal will not be administratively final.

**B.  Mr. Lizama Gutierrez's Detention is Governed By 8 U.S.C. § 1226 Not 8 U.S.C. § 1231.**

99.     Mr. Lizama Gutierrez, whose removal has been stayed by the BIA pending its review of his Motion to Reconsider, is detained pursuant to 8 U.S.C. § 1226(a); 8 U.S.C. § 1231 does not apply. *Bah,* 409 F. Supp. 3d 464.

100.     Because the BIA granted him a stay of removal, Mr. Lizama Gutierrez's removal period has not yet begun, and therefore his detention is not governed by 8 U.S.C. § 1231. According to the plain language of the 8 U.S.C. § 1231, when an individual has been granted a stay of removal by a circuit court pending judicial review of his removal order, the removal period has not yet begun. 8 U.S.C. § 1231(a)(1)(B) ("The removal period begins on the latest of the following: . . . (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order."). Therefore, Mr. Lizama Gutierrez's detention is not yet governed by that statute. It is axiomatic that when a statute is unambiguous,

28

the courts are bound to faithfully apply its plain language. *See Clark v. Absolute Collection Serv.*, 741 F.3d 487, 490 (4th Cir. 2014) ("When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (quoting *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004)).

101.    8 U.S.C. § 1231 unambiguously states that individuals like Plaintiff, who have been granted a stay of removal while seeking judicial review of a removal order, have not yet entered the removal period. It follows naturally that 8 U.S.C. § 1231 cannot govern his detention. *Bah,* 409 F. Supp. 3d 464.

102.    While the Fourth Circuit has not yet addressed this issue, every Circuit to analyze and rule on the matter has agreed with this reading of the statutory scheme. *See Wang v. Ashcroft*, 320 F.3d 130, 147 (2d Cir. 2003); *Leslie v. Att'y Gen.*, 678 F.3d 265, 270 (3d Cir. 2012), *abrogated in part on other grounds by Jennings*, 138 S. Ct. at 847; *Bejjani v. INS*, 271 F.3d 670, 689 (6th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006); *Prieto-Romero v. Clark*, 534 F.3d 1053, 1059 (9th Cir. 2008). As the Third Circuit explained in *Leslie*, "insofar as the purpose of § 1231 detention is to secure an alien pending the alien's certain removal, § 1231 cannot explain nor authorize detention during a stay of removal pending further judicial review." 678 F.3d at 270. Consequently, because 8 U.S.C. § 1231 does not govern detention while an individual's removal is stayed pending circuit court review, the pre-removal period detention statute, 8 U.S.C. § 1226, must control. *See Prieto-Romero*, 534 F.3d at 1059-60; *Wang*, 320 F.3d at 147.

103.    Mr. Lizama Gutierrez's detention falls under 8 U.S.C. § 1226. The government may argue that his prolonged detention is mandatory under 8 U.S.C. § 1226(c) based on his single misdemeanor marijuana possession conviction; however, his prolonged detention is

unconstitutional requires immediate release or an immediate bond hearing under 8 U.S.C. §
1226(a).

**C. Mr. Lizama Gutierrez's and Mr. Quintanilla Gallegos's Continued Detention Without a Bond Hearing Violates Constitutional Due Process and They Are Each Entitled to Immediate Release or an Immediate Bond Hearing.**

104.      Mr. Lizama Gutierrez's prolonged detention of almost two years and Mr.
Quintanilla Gallegos's prolonged detention of approximately 14 months violate their rights to
constitutional due process. The substantial risk of serious illness and/or death Mr. Lizama
Gutierrez, as a person with a serious respiratory medical condition, and Mr. Quintanilla
Gallegos, as a person who suffers from coronary artery disease, hypertension, hyperlipidemia,
Hepatitis A, Hepatitis C, and arthrosis, face if they contract COVID-19 further heightens the
constitutional due process violations of their prolonged detention. As such, they are  entitled to
immediate release in light of COVID-19, or, in the alternative, a bond hearing with the burden of
proof on the government to justify continued detention by clear and convincing evidence and
with a requirement that the government consider alternatives to detention and their ability to pay
bond.

*i.     Noncitizens Detained Under § 1226(c) are Entitled to Due Process Protections.*

105.      "'It is well established that the Fifth Amendment entitles aliens to due process of
law in deportation proceedings.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (addressing a §
1226(c) challenge) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "Freedom from
imprisonment—from government custody, detention, or other forms of physical restraint—lies at
the heart of the liberty" that the Due Process Clause protects. *Zadvydas v. Davis*, 533 U.S. 678,
690 (2001); *see also id*. at 718 (Kennedy, J., dissenting) ("Liberty under the Due Process Clause
includes protection against unlawful or arbitrary personal restraint or detention."). This

fundamental due process protection applies to all noncitizens, including both removable and inadmissible noncitizens. *See id*. at 721 (Kennedy, J., dissenting) ("both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious").

106.    In *Jennings v. Rodriguez*, the Supreme Court held that the Ninth Circuit erred in interpreting 8 U.S.C. §§ 1225(b) and 1226(c) to require bond hearings for detained noncitizens as a matter of statutory construction. *Jennings*, 138 S.Ct. 830 (2018). The Supreme Court's opinion; however, did not address whether the Due Process Clause required bond hearings in cases of prolonged detention and remanded to the Ninth Circuit to address the constitutional question in the first instance. *See id*.

107.    Following *Zadvydas* and *Demore*, every circuit court of appeals to confront the issue has found that due process requires a hearing for noncitizens subject to unreasonably prolonged mandatory detention pending removal proceedings. *See Borbot v. Warden Hudson Cty. Corr. Facility*, 906 F.3d 274, 278 (3d Cir. 2018) ("*Jennings* did not call into question our constitutional holding in *Diop* that detention under § 1226(c) may violate Due Process if unreasonably long.") (citing *Diop v. ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011)); *Sopo v. U.S. Attorney Gen.*, 825 F.3d 1199 (11th Cir. 2016); *Reid v. Donelan*, 819 F.3d 486 (1st Cir. 2016); *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015); *Rodriguez v. Robbins (Rodriguez III)*, 804 F.3d 1060 (9th Cir. 2015); *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003).

108.    While the Fourth Circuit has not yet ruled on the question, this Court and the U.S. District Court for the District of Maryland have held that prolonged immigration detention can violate a Plaintiff's right to due process. *See Bah v. Barr*, 409 F. Supp. 3d 464, 470 (E.D. Va. 2019); *Obando-Segura v. Whitaker*, No. GLR-17-3190, 2019 WL 423412 (D. Md. Feb. 1, 2019); *Portillo v. Hott*, 322 F. Supp. 3d 698 (E.D. Va. 2018); *Mauricio-Vasquez v. Crawford*, No.

31

1:16cv01422, 2017 WL 1476349 (E.D. Va. Apr. 24, 2017); *Haughton v. Crawford*, No. 1:16-cv-634, 2016 WL 5899285 (E.D. Va. Oct. 7, 2016); *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 710 (D. Md. 2016).

109.     This Court has adopted a five-factor balancing test for determining whether prolonged detention violates Due Process. The five factors are: "(1) the duration of detention, including the anticipated time to completion of the alien's removal proceedings; (2) whether the civil detention exceeds the criminal detention for the underlying offense; (3) dilatory tactics employed in bad faith by the parties or adjudicators; (4) procedural or substantive legal errors that significantly extend the duration of detention; and (5) the likelihood that the government will secure a final removal order." *Portillo v. Hott*, 322 F. Supp. 3d 698, 707 (E.D. Va. 2018); *see also Bah*, 409 F. Supp. 3d at 471 n.9; *Mauricio-Vasquez v. Crawford*, No. 1:16cv01422, 2017 WL 1476349, at *4-5 (E.D. Va. Apr. 24, 2017); and *Haughton v. Crawford*, No. 1:16-cv-634, 2016 WL 5899285, at *8-10 (E.D. Va. Oct. 7, 2016)).

110.     The first factor—"the most important"—is given significant weight. *Portillo*, 322 F. Supp. 3d at 707 (internal quotations omitted). *See, e.g., Bah*, 409 F. Supp. 3d at 471 n.9; *Mauricio-Vasquez*, 2017 WL 1476349 at *4. At the six-month mark, detention becomes, at the very least, increasingly suspect. *See Demore*, 538 U.S. at 529-30 (upholding only "brief" detentions under § 1226(c), which last "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal"); *Zadvydas*, 533 U.S. at 701 ("Congress previously doubted the constitutionality of detention for more than six months"); *Diop*, 656 F.3d at 234; *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 473-75 (3d Cir. 2015), *abrogated on other grounds by Jennings*, 138 S. Ct. at 847 (holding that Plaintiff detained under § 1226(c) for *one* year must receive a bond

hearing); *see also McNeil v. Dir., Patuxent Inst.,* 407 U.S. 245, 249, 250-52 (1972) (recognizing six months as an outer limit for confinement without individualized inquiry for civil commitment).[27]

### ii. *Mr. Lizama Gutierrez's Detention Has Been Unconstitutionally Prolonged.*

111.    All of the *Portillo* factors that are present in this case weigh in Mr. Lizama Gutierrez's favor. At 22 months and counting, the duration of Mr. Lizama Gutierrez's detention is unconstitutionally prolonged and already more than triple the six months that become constitutionally suspect. Moreover, the anticipated time to completion of his removal proceedings further weighs in Mr. Lizama Gutierrez's favor. This anticipated time includes not only the unquantified time the BIA may take to decide on his MTR which has been pending for 11 months—whether by its own cognition or as compelled by this Court. If and when the MTR is likely granted based on the simple and demonstrable calculation error committed by the agency in dismissing the appeal, the actual appeal process would entail at a minimum several months of additional time to complete, and there is a strong probability that it will take longer.[28]

112.    The second factor—weighing the length of civil detention against criminal detention for the underlying offense—favors Mr. Lizama Gutierrez's due process interests with equal clarity.[29]   The civil consequence leveraged by the Defendants is grossly disproportionate to

---

[27] Courts have acknowledged that "the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past those thresholds" indicated by both Congress and the Supreme Court (which amount, ultimately, to six months). *Diop,* 656 F.3d at 234.

[28] *See* Executive Office of Immigration Review, PM 20-01, Case Processing at the Board of Immigration Appeals (Oct. 1, 2019), https://www.justice.gov/eoir/page/file/1206316/download (noting only declines and plateaus in efficiency at the BIA coupled with "disconcertingly … few clear steps to address that situation" and urging, but not mandating, single Board members to adjudicate appeals within 90 but no longer than 230 days and three-member panels to do so within 180 but no longer than 355 days after filing the Notice of Appeal).

[29] Similarly, the Eleventh Circuit and the District Court for the District of Maryland have both considered whether the facility for the civil immigration detention is meaningfully different form a penal institution for criminal detention. *See, e.g., Sopo,* 825 F.3d at 1219; *Jarpa v. Mumford,* 211 F. Supp. 3d 706, 717 (D. Md. Sept. 30, 2016). Farmville Detention Center is a jail setting.

the criminal penalty for the underlying offense. While Mr. Lizama Gutierrez's civil detention is fast approaching the two-year mark, the criminal consequence for his misdemeanor marijuana possession conviction was a $100 fine and a six-month suspension of his driver's license. Even at the time, the maximum penalty he could have received was limited to 30 days in jail and a fine of $500. VA. CODE ANN. § 18.2-250.1 (West 2019). Moreover, earlier this year, Virginia signed new legislation into effect that completely removes the criminal penalty for simple possession of marijuana, which now only carries a $25 civil penalty. 2020 Va. Acts. Ch. 1285 (H.B. 972).

113.     The third factor—dilatory tactics—is of limited relevance, as Mr. Lizama Gutierrez makes no allegation of bad faith. "But," as this Court has cautioned when analyzing this third factor in the past, "the central constitutional concern is the reasonableness of detention and 'due process demands a better answer than 'we haven't gotten to it yet.''" *Haughton*, 2016 WL 5899285 at *9 (internal citation omitted).

114.     The fourth factor weighs strongly in Mr. Lizama Gutierrez's favor. The delay in Mr. Lizama Gutierrez's proceedings that has been ongoing for almost a year is the result of a procedural legal error: the Board's erroneous clerical mistake in dismissing Mr. Lizama-Gutierrez's appeal as untimely based on the mistaken belief that the IJ's written decision had been mailed on May 7, instead of May 8. *See* Exh. C.

115.     Finally, the fifth factor— the likelihood that the government will secure a final removal order—is, for the reasons outlined above, purely speculative and unlikely.

116.     Under this Court's *Portillo* factors, Mr. Lizama Gutierrez detention is unreasonable and unconstitutional.

### iii.     *Mr. Quintanilla Gallegos's Detention Has Been Unconstitutionally Prolonged.*

34

117.     Mr. Quintanilla Gallegos's detention—lasting approximately 14 months at the time of this filing—is unconstitutionally prolonged. The duration of Mr. Quintanilla Gallegos's detention is already more than double the six-month mark at which detention is considered, at the very least, increasingly suspect as such. Moreover, the anticipated time to completion of his removal proceedings further weighs in Mr. Quintanilla Gallegos's favor. Under the third factor, Mr. Quintanilla Gallegos should not be penalized for making good faith efforts to pursue his due process right to relief in maintaining his long-time Lawful Permanent Resident status through post-conviction relief of his constitutionally infirm conviction. *See Haughton*, No. 1:16-cv-634, 2016 WL 5899285 at *9; *Ly*, 351 F.3d at 272 ("merely because he seeks to explore avenues of relief that the law makes available to him."); *Diop*, 656 F.3d at 223. The fourth factor also weighs strongly in Mr. Quintanilla Gallegos's favor. The delay in Mr. Quintanilla Gallegos's proceedings that has been ongoing for over a year is the result of a substantive and legal error: a constitutionally infirm conviction rendered by ineffective assistance of counsel in violation of *Padilla v. Kentucky*, 559 U.S. 356 (2010), which is pending post-conviction relief. At present, the fifth factor—likelihood that the government will secure a final removal order—is purely speculative, particularly as Mr. Quintanilla Gallegos has a viable claim to maintain his Lawful Permanent Resident status.

### D.  Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos Are Entitled to Immediate Release or Immediate Bond Hearings.

118.     When detention becomes unreasonable—in other words, "when the burden to an alien's liberty outweighs a mere presumption that the alien will flee and/or is dangerous"—Due Process concerns arise. *Chavez-Alvarez v*, 783 F.3d at 475. In the immigration context, the Supreme Court has recognized only two valid purposes for civil detention—to mitigate the risks of danger to the community and to prevent flight. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

35

Mr. Lizama Gutierrez's ongoing deprivation of liberty is not sufficiently related to either of these governmental purposes, and because he has not been afforded the necessary procedural safeguards, his detention violates due process. This Court should order his immediate release.

119. In the alternative, due process demands an individualized hearing, among other procedural safeguards to protect against the unconstitutional deprivation of liberty interests. These procedural safeguards include, *inter alia*, the requirements that the government must prove by clear and convincing evidence that detention is still necessary to fulfill the statute's purposes, and it must do so by clear and convincing evidence that the person is a flight risk and/or a danger to the community; that alternatives to detention be considered; and that the noncitizen's ability to pay bond be considered.

### i. *The Government Must Bear the Burden by Clear and Convincing Evidence.*

120. In addition to an individualized hearing before a neutral decision-maker, due process requires the Government to provide Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos with other procedural safeguards to protect against their erroneous deprivations of liberty. Should the Court determine that Mr. Lizama Gutierrez's and Mr. Quintanilla Gallegos's due process rights require individualized bond hearings before an immigration judge, the Court must place the burden of proof by clear and convincing evidence on the Government to demonstrate that they are a danger or flight risk. *See United States v. Salerno*, 481 U.S. 739, 750, 752 (1987) (upholding pre-trial detention where "full-blown adversary hearing," requiring "clear and convincing evidence" and "neutral decision maker"); *Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992) (striking down civil detention scheme that placed burden on the detainee); *Zadvydas*, 533 U.S. at 692 (finding post-final-order custody review procedures deficient because, inter alia, they placed burden on detainee).

121.     Where a noncitizen has been subject to mandatory detention for periods comparable to Mr. Lizama Gutierrez's and Mr. Quintanilla Gallegos's time in detention, this Court has ordered individualized bond hearings in which the Government bears the burden by clear and convincing evidence of showing the necessity of continued detention. *See Bah*, 409 F. Supp. 3d at 472 (placing the evidentiary burden of production on the noncitizen but noting "As a matter of Due Process, the government bears the ultimate burden of persuasion."); *Portillo*, 322 F. Supp. 3d at 709-710; *Haughton*, No. 1:16-cv-634, at *22; *but see Mauricio-Vasquez v. Crawford*, No. 1:16cv01422, 2017 WL 1476349 (E.D. Va. Apr. 24, 2017). Several other courts have similarly placed the burden on the government. *See, e.g., Obando-Segura*, No. GLR-17-3190, at *9; *Jarpa*, 211 F. Supp. 3d at 721; *Diop*, 656 F.3d at 233; *Reid*, 390 F. Supp. 3d at 228; *Lora*, 804 F.3d at 616; *Rodriguez*, 804 F.3d at 1087; *Dukuray v. Decker*, 18 CV 2898 (S.D.N.Y. Oct. 25, 2018); *Brissett v. Decker*, 324 F. Supp. 3d 444 (S.D.N.Y. 2018); *Gordon v. Shanahan*, No. 15-cv-261, 2015 WL 1176706 (S.D.N.Y. Mar. 13, 2015); *Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533 (S.D.N.Y. 2014); *Francois v Napolitano*, No. 12-2806, 2013 WL 4510004 (D.N.J. Aug. 23, 2013); *Martinez v. Muller*, No. 12-1731, 2012 WL 4505895 (D.N.J. Sept. 25, 2012).[30]

122.     "[I]n light of the ongoing infringement of the alien's liberty interest and the strong tradition that the burden of justifying civil detention falls on the government," Mr. Lizama

---

[30] In fact, a growing chorus of courts have recognized that in *any* individualized bond hearing held under 8 U.S.C. § 1226(a), the burden is on the Government to justify continued detention. *See, e.g., Dubon Miranda v. Barr*, No. 20-1110, 2020 WL 2794488 at *9 (D. Md. May 9, 2020); *Brito v. Barr*, 415 F. Supp. 3d 258, 267 (D. Mass. 2019), *appeal docketed*, No. 20-1119 (1st Cir. 2020); *Darko v. Sessions*, 342 F. Supp. 3d 429, 435 (S.D.N.Y. 2018) (noting "there has emerged a consensus view that where . . . the government seeks to detain a [noncitizen] pending removal proceedings, it bears the burden of proving that such detention is justified" under § 1226(a) and collecting cases); *Pensamiento v. McDonald*, 315 F. Supp. 3d 684, 692–93 (D. Mass.), *appeal dismissed by gov't*, No. 18-1691 (1st Cir. Dec. 26, 2018); *Guerrero v. Decker*, No. 19 CIV 11644 (KPF), 2020 WL 1244124, at *3–4 (S.D.N.Y. Mar. 16, 2020); *Aparicio-Villatoro v. Barr*, No. 6:19-cv-06294-MAT, 2019 WL 3859013, at *6 (W.D.N.Y. Aug. 16, 2019); *Arellano v. Sessions*, No. 6:18-cv-06625-MAT, 2019 WL 3387210, at *11 (W.D.N.Y. July 26, 2019); *Diaz-Ceja v. McAleenan*, No. 19-cv-00824-NYW, 2019 WL 2774211, at *10–12 (D. Colo. July 2, 2019); *Velasco Lopez v. Decker*, 19-cv-2912, 2019 WL 2655806 (ALC), at * 3 (S.D.N.Y. May 15, 2019), *appeal docketed*, No. 19-2284 (2d Cir. 2019).

Gutierrez's and Mr. Quintanilla Gallegos's continued civil detention under 8 U.S.C. § 1226 can pass constitutional muster only if the Government bears the burden of proving by clear and convincing evidence that Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos present a risk of flight or a danger to the community. *Portillo*, 322 F. Supp. 3d at 709.

123.     In *Obando-Segura*, the Maryland district court provided four reasons as to why the burden of proof for bond hearings for individuals in prolonged detention under 8 U.S.C. § 1226(c) must be placed on the government by clear and convincing evidence. *See Obando-Segura*, No. GLR-17-3190, at *7. First, the court stated that 8 C.F.R. § 236.1(c)(8), which places the burden of proof in bond hearings on the individual, dictates the burden of proof for immigrants detained under 8 U.S.C. § 1226(a) (where the Attorney General exercises his discretion in detaining the individual), does not apply in cases of mandatory detention under 8 U.S.C. § 1226(c) where no individualized bond determination is made prior to prolonged detention. Second, the court reiterated that a bond hearing under 8 U.S.C. § 1226(c) as a necessity to avoid due process concerns removes it from 8 C.F.R. § 236.1(c)(8), where the Attorney General's discretion presumes the detention to be consistent with due process. *Id*. at *7-8. Third, the court stated that placing the burden on an individual in mandatory detention raising due process concerns would "run contrary to the Court's determination on the unconstitutionality of his continued detention absent a hearing." *Id*. at *4 (quoting *Jarpa*, 211 F. Supp. 3d at 722-723). Finally, placing the burden of proof on an individual in mandatory detention imposes a "special unfairness" on the detained individual. *Id*. (citation omitted). An individual's prolonged detention as the court went on to state "compromises his ability to gather the evidence he needs to complete his . . . application and may also affect his ability to prepare for his [hearings]." *Id*.

124.     To place the burden on Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos at a

bond hearing ordered as a result of a violation of his constitutional rights would be "inconsistent

with having found his continued detention unconstitutional." *Jarpa*, 211 F. Supp. 3d at 722.

Requiring Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos to each prove "that he is neither a

flight risk nor a danger would also logically mean that he is presumed validly and

constitutionally detained unless he demonstrates otherwise. *Id*. In order to "ensure [the protection

of Mr. Lizama Gutierrez's] liberty interests are wholly protected and practically effectuated," the

court must require the Government to justify confinement by clear and convincing evidence. *Id*.

at 723 (quotations omitted).

ii.     ***The Government Must Consider the Available Alternatives to Detention.***

125.     Due process also requires consideration of alternatives to detention. The primary

purpose of immigration detention is to ensure a noncitizen's appearance during removal

proceedings. *Zadvydas*, 533 U.S. at 697. Detention is not reasonably related to this purpose if

there are alternative conditions of release that could mitigate risk of flight. *See Bell v. Wolfish*,

441 U.S. 520, 538 (1979). ICE's alternatives to detention program—the Intensive Supervision

Appearance Program—has achieved extraordinary success in ensuring appearance at removal

proceedings, reaching compliance rates close to 100 percent. *Hernandez v. Sessions*, 872 F.3d

976, 991 (9th Cir. 2017) (observing that ISAP "resulted in a 99% attendance rate at all EOIR

hearings and a 95% attendance rate at final hearings"). It follows that alternatives to detention

must be considered in determining whether prolonged incarceration is warranted.

*iv. Mr. Lizama Gutierrez's and Mr. Quintanilla Gallegos's Ability to Pay Must be Taken
into Account*

126.     Finally, if the government cannot meet its burden of proof and justify continued

detention, due process warrants an additional protection: that the noncitizen's ability to pay a

bond be considered in determining the appropriate conditions of relief. As a the possibility of a high bond amount that is not reasonably related to the purpose for confinement would mean "[h]e is effectively detained without bond due to [his] financial circumstances" and defeat the purpose for this Court to order an individualized bond hearing in the first place. *Dubon Miranda v. Barr*, ___F.Supp.3d ___, *11, 2020 WL 2794488, ECF No. 25 (D.Md. May 29, 2020) (Preliminary Injunction placing the burden on the government to prove flight risk and danger to the community and requiring an Immigration Judge to consider inability to pay and alternatives to detention).

## II.    Due Process and the Rehabilitation Act Require Plaintiffs' Immediate Release.

### A.    Plaintiffs Have a Right to be Free from Punitive Conditions of Confinement in Civil Detention.

127.    The government has a duty to provide conditions of reasonable health and safety to individuals in their custody. As the Supreme Court has explained, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 199-200 (1989). As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200.

128.    Conditions that pose an unreasonable risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass. *See Helling v. McKinney,* 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

129.     The Supreme Court has explicitly recognized that the risk of contracting a
communicable disease may constitute such an "unsafe, life-threatening condition" that threatens
"reasonable safety" even under the higher standard imposed by the Eighth Amendment. *Id.*

130.     Because persons in immigration detention are civilly confined, their constitutional
protections are derived from the Fifth Amendment, which provides greater protections than the
Eighth Amendment. Under the Fifth Amendment, persons who, like Plaintiffs, are held in civil
detention are entitled to "more considerate treatment and conditions of confinement" than
persons who are incarcerated because of a criminal conviction. *Youngberg v. Romeo*, 457 U.S.
307, 322 (1982). Due process rights of those in civil immigration detention "are *at least as great*
as the Eighth Amendment protections" available to those convicted of a crime. *City of Revere v.
Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983) (emphasis added); *see also Zadvydas v.
Davis,* 533 U.S. 678, 690 (2001) (classifying immigration detention as civil detention).

131.     The Eighth Amendment, which applies to persons convicted of criminal offenses,
allows punishment as long as it is not cruel and unusual, but the Fifth Amendment's due process
protections do not allow punishment at all. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due
process requires that a pretrial detainee not be punished."); *Nelson v. Collins*, 659 F.2d 420, 425
(4th Cir. 1981).

132.     In order to establish that a particular condition of detention constitutes
impermissible punishment, a plaintiff must show either an expressed intent to punish, or a lack of
a reasonable relationship to a legitimate governmental purpose, from which an intent to punish
may be inferred. *See Wolfish*, 441 U.S. at 538; *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir.
1988). Absent an explicit intention to punish a detained person, a court "must evaluate the
evidence and ascertain the relationship between the actions taken against the detainee and the

custodian's supporting rationale." *Williamson v. Stirling*, 912 F.3d 154, 178 (4th Cir. 2018).

"That inquiry turns on whether the actions taken may validly be attributed to an alternative,

nonpunitive rationale, and whether they appear 'excessive in relation to the alternative purpose

assigned.'" *Id*. (citations omitted).

### B. Defendants May Not Act with Deliberate Indifference to a Substantial Risk of Harm Faced by Plaintiffs.

133.     The Fourth Circuit has held that a person held in pretrial detention necessarily

"makes out a due process violation if he shows 'deliberate indifference to serious medical

needs'. . . because no legitimate nonpunitive goal is served by a denial or unreasonable delay in

providing medical treatment where the need for such treatment is apparent." *Martin v. Gentile*,

849 F.2d 863, 871 (4th Cir. 1988) (citation omitted)).

134.     In order to show that defendants acted with deliberate indifference, a plaintiff

must show that (1) the plaintiff was exposed to a substantial risk of serious harm, and (2) the

defendants knew of or disregarded that substantial risk to the plaintiff's health or safety. *Farmer

v. Brennan*, 511 U.S. 825, 834, 837–38 (1994); *Thompson v. Virginia*, 878 F.3d 89, 97-98 (4th

Cir. 2017).

135.     A plaintiff "must establish a serious deprivation of his rights in the form of a

serious or significant physical or emotional injury" or *substantial risk* of either injury. *Danser v.

Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). Such a claim "may be based on a defendant's

conduct in exposing an inmate to an unreasonable risk of future harm." *Smith v. Carpenter*, 316

F.3d 178, 188 (2d Cir. 2003).

136.     A plaintiff must also show that the prison or detention official involved had "a

sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or

safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual

knowledge of an excessive risk to the detained person's safety, or evidence that detention officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways, including inference from circumstantial evidence'" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016).

## C. Plaintiffs Have a Right to Reasonable Accommodations Under the Rehabilitation Act.

137.    Section 504 of the Rehabilitation Act requires executive agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

138.    DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30.

139.    To state a claim under the Rehabilitation Act, a plaintiff must establish "(1) that he has a disability; (2) that he is otherwise qualified for the benefit in question; and (3) that he was excluded from the benefit due to discrimination solely on the basis of the disability." *Baird v. Rose,* 192 F.3d 462, 467 (4th Cir. 1999).

140.    To the extent possible, the Americans with Disabilities Act ("ADA") and the Rehabilitation Act should be construed to impose similar requirements; therefore, they require a plaintiff to demonstrate the same elements to establish liability. *Halpern v. Wake Forest Univ. Health Scis.,* 699 F.3d 454 (4th Cir. 2012).

141.    A qualifying disability is any physical or mental impairment that "substantially limits one or more major life activities." 42 U.S.C. § 12102; *see also* 29 U.S.C. § 705; 6 C.F.R. § 15.3(d). A "major life activity" includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" as well as "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(A)-(B).

142.    The ADA mandates that "[t]he definition of disability . . . be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of [the statute]." 42 U.S.C. § 12102(4)(A).

143.    The Fourth Circuit has determined that a temporary impairment may qualify as a disability under the ADA if it is "sufficiently severe" to substantially limit a major life activity. *Summers v. Altarum Inst.,* 740 F.3d 325 (4th Cir. 2014).

144.    The Rehabilitation Act provides for "reasonable accommodations" to ensure that individuals are not deprived of access to federally-administered benefits because of their disability. Because social distancing is not possible at Farmville, and there is no reasonable accommodation available to protect vulnerable individuals from contracting COVID-19, release is the only sufficient accommodation available.

### D.  This Court Has the Authority to Order Plaintiffs' Release to Protect Their Constitutional and Statutory Rights.

145.    "A district court enjoys wide discretionary authority in formulating remedies for constitutional violations." *Smith v. Bounds*, 813 F.2d 1299, 1301 (4th Cir. 1987). Moreover,

"[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

146.     Although the Fourth Circuit has not had occasion to address this issue, courts in other circuits have exercised the authority to order release as a remedy for constitutional violations. *See, e.g., Duran v. Elrod,* 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied,* 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap).

147.     In light of the severe threats posed by COVID-19, a growing number of courts have also ordered the release of persons detained in immigration detention. *See e.g.*, *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *Hope v. Doll*, 1:20-cv-00562-JEJ, No. 1:20-cv-562, Dkt. No. 11 (M.D. Pa. Apr. 7, 2020) (granting TRO releasing high-risk individuals in immigration detention due to the dangers of COVID-19); *Hernandez v. Wolf*, 5:20-cv-00617-TJH-KS, Dkt. No. 17 (C.D. Cal. Apr. 1, 2020); *Castillo v. Barr*, 20-cv-00605-TJH, Dkt. No. 32 (C.D. Cal. Mar. 27, 2020) (same); *Coronel v. Decker*, 20-cv-2472-AJN, Dkt. No. 26 (S.D.N.Y. Mar. 27, 2020) (same); *Basank v. Decker*, 20-cv-2518-AT, Dkt. No. 11 (S.D.N.Y. Mar. 26, 2020) (same); *Fraihat v. Wolf*, 20-cv-00590-TJH-KSx (C.D. Cal. Mar. 31, 2020) (same); *Thakker v. Doll*, 1:20-cv-00480-JEJ, Dkt No. 47 (M.D. Pa. Mar. 31, 2020) (ordering releases from two facilities in Pennsylvania lacking confirmed cases); *see also Ronal Umana Jovel v. Decker*, 12-cv-308-GBD, Dkt. No. 27 (S.D.N.Y. Mar. 26, 2020) (ordering release under *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001)); *Jimenez v. Wolf*, 18-10225-MLW (D. Mass. Mar. 26, 2020) (same).

148.     Courts have similarly released numerous individuals held or incarcerated under the federal criminal system. *See e.g.*, *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to people in detention); *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time); *United States v. Muniz*, Case No. 4:09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Hector*, Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to folks in prison); *United States v. Grobman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed - with one

exception. That one exception - COVID-19 - however, not only rebuts the statutory presumption

of dangerousness, see 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United*

*States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that

incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far

greater risk to community safety than the risk posed by Defendant's release to home confinement

on . . . strict conditions."); *In re Request to Commute or Suspend County Jail Sentences*, Docket

No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail

"in light of the Public Health Emergency" caused by COVID-19).

149.     The unprecedented coronavirus pandemic unquestionably calls for Plaintiffs'

release, as multiple health experts have opined, and numerous courts have recognized, that no

other measures would be sufficient or appropriate, especially for individuals with special

vulnerability to severe illness or death from COVID-19.

## III.     The Board of Immigration Appeals' Inaction on Mr. Lizama Gutierrez's Motion to Reconsider Violates the Administrative Procedures Act.

### A.  Jurisdiction, Cause of Action, and Mandamus.

150.     This Court has subject matter jurisdiction under both 28 U.S.C. § 1331, the

federal question statute, and 28 U.S.C. § 1361, the mandamus statute. Mandamus "may be

invoked only where three elements co-exist: (1) the Plaintiff has shown a clear right to the relief

sought; (2) the Defendant has a clear duty to do the particular act requested by the Plaintiff; and

(3) no other adequate remedy is available." *In re First Fed. Sav. & Loan Ass'n of Durham*, 860

F.2d 135, 138 (4th Cir. 1988).

151.     The Administrative Procedures Act ("APA") provides a basis for suit when an

agency unreasonably delays action or fails to act, and therefore supports a cause of action. 5

U.S.C. §§ 555(b), 706(1); *see Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77-78

(D.C. Cir. 1984) ("TRAC") ("[S]ection 706(1) coupled with section 555(b) does indicate a

congressional view that agencies should act within reasonable time frames and that courts

designated by statute to review agency actions may play an important role in compelling agency

action that has been improperly withheld or unreasonably delayed."). Section 555(b) states that

agencies should conclude matters "within a reasonable time," and Section 706(1) states that

courts "shall ... compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§

555(b), 706(1). Moreover, an agency's failure to act can become a final agency action "if the

agency delays unreasonably in responding to a request for action." *See, e.g., Gordon v. Norton*,

322 F.3d 1213, 1220 (10th Cir. 2003). Such is the case here, and the BIA's refusal to address the

Motion to Review for over eleven months and counting thus constitutes final agency action

reviewable as "unlawfully withheld or unreasonably delayed."

**B. The Board of Immigration Appeal's Inaction is Unreasonable and Improper.**

152.    The following factors, known as the "TRAC" factors, often guide whether agency

inaction is reasonable:

*i.* The time agencies take to make decisions must be governed by a "rule of reason";

*ii.*    where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

*iii.*    delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

*iv.*    the Court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

*v.*    the Court should also take into account the nature and extent of the interests prejudiced by delay;

*vi.*    the Court should not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably denied.

48

*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC").

This Court has also adopted the TRAC factors in the past. *E.g. Asslam v. Mukasey*, 531 F. Supp.

2d 736, 744 (E.D. Va. 2008); *Assadi v. Beers*, No. 1:13–cv–01253 (AJT/TRJ), 2014 WL

12775195, at *6 (E.D. Va. Feb. 12, 2014).

153.    The first factor weighs heavily in favor of finding the delay in processing the

MTR unreasonable. In evaluating this factor, "[a]n agency must be given adequate time to

complete an adjudication that is complex or labor intensive," but the MTR presents neither

challenge. *Asslam*, 541 F. Supp. 2d at 743. The MTR simply asks the BIA to acknowledge its

own clear clerical mistake and reconsider its dismissal of Mr. Lizama Gutierrez's Notice of

Appeal. To support this ask the MTR has presented the Board with undisputed evidence that it

needs in order to adjudicate the motion. *See* Exh. C (including a copy of the postmarked

envelope sent by the Immigration Court).

154.    As to the second factor, although there is no statutory or regulatory deadline for

Motions to Review—as the BIA has pointed out in response to counsel's requests for updates—

the absence of a deadline does not confer the right to postpone a decision indefinitely. Although

Congress did not provide a timetable for the review of MTR's, the EOIR's own memorandum

urging the BIA to complete the entire appeals within an maximum of 355 days calls into sharp

relief that the MTR has taken even longer to review. *See* n.2, *infra*.

155.    Likewise, the third factor and fifth factors underscore the unreasonableness of the

BIA's delay. The unanswered MTR has left Mr. Lizama Gutierrez in limbo. For as long as the

BIA refuses to correct its error, and unless and until this Court grants Mr. Lizama Gutierrez's

petition for a writ of habeas corpus, his only other option is to expedite deportation by foregoing

his stay of removal. He deserves and is holding onto the chance to appeal the order of removal

and prove himself eligible for asylum, withholding of removal, or protection under the

Convention Against Torture—a right which he is categorically preventing from doing so as long

as the BIA refuses to review the MTR— and concede it's own clerical error. The BIA's delay is

patently "less tolerable" in a situation like Mr. Lizama Gutierrez's, per the third factor, and, per

the fifth factor, the nature and extent of the interests prejudiced by the delay are a matter of life,

liberty, and livelihood, each effectively stripped away by the BIA's inaction.

156.     Finally, the fourth factor is often elevated in *TRAC* analyses, but is uncompelling

here. The MTR is a simple request to correct a readily demonstrated clerical mistake and reverse

the dismissal of Mr. Lizama Gutierrez's appeal. It does not position him ahead of other appellees

and does not mean that he will automatically succeed on the merits of his appeal. Nor does it

demand great resources or effort on the part of the BIA, although it should be noted that

"[b]ureaucratic inadequacy is not a justification, especially because the costs of noncompliance

are imposed on the applicant." *Aslam*, 531 F. Supp. 3d at 744. And the cost in this case, Mr.

Lizama's liberty and the effect this has had on his mental and physical health is great.

157.     For the foregoing reasons, the BIA's delay is unreasonable final action subject to

review under and in violation of the Administrative Procedures Act, and the BIA should be

compelled to act on Mr. Lizama-Gutierrez's MTR.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF: VIOLATION OF THE DUE PROCESS CLAUSE
OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION
(Against Defendants Hott, Crawford, Wolf, Albence, ICE)
(On Behalf of Plaintiffs Lizama Gutierrez and Quintanilla Gallegos)**

158.     Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos re-allege and incorporate by

reference the paragraphs above.

50

159.     The Due Process Clause of the Fifth Amendment forbids the Government from depriving any person of liberty without due process of law. U.S. CONST. amend. V.

160.     To justify Mr. Lizama Gutierrez's and Mr. Quintanilla Gallegos's ongoing prolonged detention, due process requires that the government establish, at an individualized hearing before a neutral decision-maker, that Mr. Lizama Gutierrez's and Mr. Quintanilla Gallegos's detention is justified by clear and convincing evidence of flight risk or danger to the community, even after consideration whether alternatives to detention could sufficiently mitigate that risk, and taking into account his ability to pay bond.

161.     Mr. Lizama Gutierrez's prolonged detention without a constitutionally adequate bond hearing for nearly two years, which will potentially continue for many additional months or even years as the Motion to Reconsider upon which his appeal of his removal order is predicated remains pending and as he pursues that appeal, is not reasonably related to the immigration detention statute's purpose of ensuring his appearance during removal proceedings or preventing danger to the community, and therefore violates the Due Process Clause. Mr. Quintanilla Gallegos's prolonged detention without a constitutionally adequate bond hearing for approximately 14 months similarly is not reasonably related to the immigration detention statute's purpose and violates the Due Process Clause.

162.     Nor has Mr. Lizama Gutierrez or Mr. Quintanilla Gallegos been afforded the necessary procedural safeguards to guarantee against their erroneous deprivations of liberty, especially as their detention continues indefinitely and grows increasingly prolonged.

163.     The substantial risk of serious illness and/or death Mr. Lizama Gutierrez, as a person with a serious respiratory medical condition, and Mr. Quintanilla Gallegos, as a person who suffers from coronary artery disease, hypertension, hyperlipidemia, Hepatitis A, Hepatitis C,

and arthrosis, face if they contract COVID-19 further heightens the constitutional due process violations of their prolonged detention.

## SECOND CLAIM FOR RELIEF: VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT – 8 U.S.C. § 1226
### (Against Defendants Hott, Crawford, Wolf, Albence, ICE)
### (On Behalf of Plaintiff Lizama Gutierrez)

164.     Mr.  Lizama Gutierrez re-alleges and incorporates by  reference  each  and  every allegation contained above.

165.     Because Mr. Lizama Gutierrez is seeking judicial review of his removal order and his removal has been stayed by the BIA pending appeal, his detention is governed by the pre-removal period detention statute, 8 U.S.C. §1226, not 8 U.S.C. §1231.

166.     By continuing to detain Mr. Lizama Gutierrez without a bond hearing for almost two years, and for almost eight months  since  the Fourth  Circuit entered  its  order  staying  his removal pending appeal, Defendants are violating Mr. Lizama Gutierrez's rights under 8 U.S.C. §1226.

167.     Accordingly, Mr.  Lizama Gutierrez is entitled to an immediate hearing before an Immigration Judge to make an individualized determination of his eligibility for release on bond or parole.

## THIRD CLAIM FOR RELIEF: VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT
### (Against Defendants Barr, McHenry, Wetmore, Board of Immigration Appeals)
### (On Behalf of Plaintiff Lizama Gutierrez)

168.     Mr. Lizama Gutierrez re-alleges and incorporates by reference the paragraphs above.

169.     The Administrative Procedures Act compels agencies to act within a reasonable time, and unreasonable delay or failure to do so violates the Act and is subject to judicial review. 5 U.S.C. §§ 555(b), 706(1).

170.     The Board of Immigration Appeals' ongoing delay in reviewing Mr. Lizama Gutierrez's Motion to Review is unreasonable. The delay is not governed by any rule of reason, places human health and welfare at risk, concerns an easily resolved and not complex matter whose resolution will not detract from other agency priorities, and deeply prejudices Mr. Lizama Gutierrez's right to appeal and, ultimately, his opportunity to rejoin society as a productive member.

171.     For these reasons, the BIA's delay violates the Administrative Procedures Act.

**FOURTH CLAIM FOR RELIEF: VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS (UNLAWFUL PUNISHMENT) (Against Defendants Hott, Crawford, Wolf, Albence, ICE) (On Behalf of All Plaintiffs)**

172.     The Fifth Amendment to the U.S. Constitution guarantees civil detainees, including immigration detainees, the right to be free from punitive conditions of confinement. The government violates this guarantee when conditions of confinement lack a reasonable relationship to any legitimate governmental purpose, *i.e.* when a custodian's actions are excessive in relation to their purpose.

173.     Defendants have subjected Plaintiffs to conditions of confinement that increase their risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure. Plaintiffs' underlying condition—of which Defendants are or should be aware—render them especially vulnerable to severe illness or even death if they contract COVID-19. Defendants are therefore subjecting Plaintiffs to an unreasonable risk of serious harm and punitive conditions, in violation of their rights under the Due Process Clause.

174.     Defendants' continued detention of Plaintiffs fails to adequately protect Plaintiffs from the risks of contracting COVID-19.

175.     Plaintiffs' ongoing confinement lacks a reasonable relationship to any legitimate governmental purpose or is excessive in relation to its purpose.

176.     Defendants continued detention of Plaintiffs is punitive and therefore violates the Due Process Clause.

**FIFTH CLAIM FOR RELIEF: VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS (DELIBERATE INDIFFERENCE) (Against Defendants Hott, Crawford, Wolf, Albence, ICE) (On Behalf of All Plaintiffs)**

177.     The Fifth Amendment to the U.S. Constitution guarantees civil detainees, including immigration detainees, the right to be free from punitive conditions of confinement. The government violates this guarantee when it acts with deliberate indifference when failing to safeguard the health and safety of those in its custody.

178.     The government acts with deliberate indifference when it exposes detainees to a substantial risk of serious harm, and when it knows of or disregards that substantial risk to the detainee's health or safety.

179.     Defendants have subjected Plaintiffs to conditions of confinement that increase their risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure. Plaintiffs' underlying conditions render them especially vulnerable to severe illness or death if they were to contract COVID-19. Defendants are therefore subjecting Plaintiffs to a substantial risk of serious harm.

180.     Defendants have known of or disregarded the substantial risk of harm to Plaintiffs' health and safety.

181.     Defendants have acted with deliberate indifference to Plaintiffs' health and safety, in violation of the Due Process Clause.

**SIXTH CLAIM FOR RELIEF: VIOLATION OF THE REHABILITATION ACT**
**(FAILURE TO PROVIDE REASONABLE ACCOMMODATION TO PERSONS WITH DISABILITIES)**
**(Against Defendants Hott, Crawford, Wolf, Albence, ICE)**
**(On Behalf of All Plaintiffs)**

182.     Section 504 of the Rehabilitation Act requires federal agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

183.     DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30; *see also* 29 U.S.C. § 794(a). The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

184.     The removal process, which includes adjudications of applications for relief from removal in immigration court, is a benefit administered by DHS and Plaintiffs are entitled to participate in the removal process. The services, programs, and activities within the detention center where DHS detains Plaintiffs receive substantial federal financial assistance.

185.     Plaintiffs' underlying medical conditions qualify as disabilities for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

186.     By exposing them to a heightened risk of contracting COVID-19 and thereby serious illness and/or death, Defendants are preventing Plaintiffs from participating in the removal process and the services, programs, and activities within the detention center by reason of their disability.

187.     By failing to take account of their special vulnerability to severe illness or death if they were to contract COVID-19, Defendants are preventing Plaintiffs from participating in the removal process and the services, programs, and activities within the detention centers by reason of their disability.

188.     By failing to provide Plaintiffs adequate protection from COVID-19 through the only effective means to reduce the risk of severe illness or death, Defendants have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of removal proceedings and the services, programs, and activities within the detention centers with respect to Plaintiffs.

189.     The only available "reasonable accommodation" that would mitigate Plaintiffs' disability is release from detention.  Defendants have failed to implement this reasonable accommodation, which would not be unduly burdensome nor require a fundamental alteration in the removal process or the services, programs, and activities of the detention center.

190.     Defendants should also be ensuring [list any injunctive asks here].

191.     Defendants' ongoing detention of Plaintiffs constitutes discrimination because it is either disparate treatment of, or at the very least has a disparate impact on, people with

qualifying disabilities who are at severe risk of serious illness or death if they were to contract COVID-19.

192.    For these reasons, Defendants' ongoing detention of Plaintiffs violates the Rehabilitation Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

a.    Issue a writ of habeas corpus and order Plaintiffs' immediate release or placement in community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures, on the ground that their continued detention violates the Due Process Clause and/or the Rehabilitation Act;

b.    In the alternative, issue injunctive relief ordering Defendants to immediately release all Plaintiffs or place them in community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures, on the ground that their continued detention violates the Due Process Clause and/or the Rehabilitation Act;

c.    With respect to Plaintiffs Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos:

*i.*    Declare that Defendants' prolonged detention of Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos without a bond hearing violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

*ii.*    Issue a writ of habeas corpus ordering Defendants to immediately release Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos; or,

*iii.*    In the alternative, issue a writ of habeas corpus ordering Defendants to schedule an individualized hearing before an Immigration Judge with the burden of proof on the Government to establish whether Mr. Lizama Gutierrez and Mr.

Quintanilla Gallegos present a risk of flight or danger and ordering the

Immigration Judge to consider alternatives to detention and take into account their

ability to pay a bond within seven days;

    *iv.* Order Defendants to immediately release Mr. Lizama Gutierrez and Mr.

Quintanilla Gallegos if a bond hearing is not held within seven days;

d.    With respect to Plaintiff Mr. Lizama Gutierrez:

    i.    Declare that the Board of Immigration Appeals' inaction in Mr. Lizama Gutierrez's

case violated the Administrative Procedures Act, 5 U.S.C. §§ 555(b) and 706;

    ii.    Grant a Writ of Mandamus ordering Defendant Board of Immigration Appeals to

immediately review Mr. Lizama Gutierrez's Motion to Reconsider;

e.    Award Plaintiffs all costs incurred in maintaining this action, including attorneys'

fees under the Equal Access to Justice Act, 5 U.S.C. § 504, 28 U.S.C. § 2412; and on any other

basis justified by law; and

f.    Grant any other and further relief this Court deems just and proper.


Dated: June 26, 2020            Respectfully submitted,
      Washington, D.C.

                     */s/ Adina Appelbaum*
                     Adina Appelbaum, Virginia Bar No. 88974
                     adina@caircoalition.org
                     **CAPITAL AREA IMMIGRANTS' RIGHTS**
                     **(CAIR) COALITION**
                     1612 K Street NW Suite 204
                     Washington, DC 20006
                     (202) 899-1412

                     Sirine Shebaya*
                     sirine@nipnlg.org
                     Amber Qureshi*
                     amber@nipnlg.org

**NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788

Kristin Donovan, Va. Bar No. 92207
kristin@justice4all.org
Granville Warner, Va. Bar. No. 24957
cwarner@justice4all.org
**LEGAL AID JUSTICE CENTER**
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 778-3450

*Pro Bono Attorneys for Petitioners-Plaintiffs*

* *pro hac vice* applications forthcoming