**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| LIZAMA GUTIERREZ, *et al.*, | |
| *Petitioners-Plaintiffs*, | Civil Action No.: 1:20-cv-00712-LMB-IDD |
| v. | **ORAL ARGUMENT REQUESTED** |
| HOTT, *et al.,* | |
| *Respondents-Defendants.* | |

<u>**PETITIONERS'-PLAINTIFFS' REPLY IN SUPPORT OF THEIR CORRECTED**</u>
<u>**PETITION FOR WRIT OF HABEAS CORPUS AND MANDAMUS AND COMPLAINT**</u>
<u>**FOR INJUNCTIVE AND DECLARATORY RELIEF**</u>

Adina Appelbaum, Virginia Bar No. 88974
 adina@caircoalition.org
**CAPITAL AREA IMMIGRANTS'**
**RIGHTS COALITION**
1612 K Street NW Suite 204
Washington, DC 20006
(202) 899-1412

Kristin Donovan, Va. Bar No. 92207
kristin@justice4all.org
Granville Warner, Va. Bar. No. 24957
cwarner@justice4all.org
**LEGAL AID JUSTICE CENTER**
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 778-3450

Sirine Shebaya*
 sirine@nipnlg.org
Amber Qureshi*
 amber@nipnlg.org
**NATIONAL IMMIGRATION**
**PROJECT OF THE NATIONAL**
**LAWYERS GUILD**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788

*Attorneys for Petitioners-Plaintiffs*

* Admitted *pro hac vice*

## INTRODUCTION

Petitioners-Plaintiffs Lizama Gutierrez, Quintanilla Gallegos, Palomares Reyes, and Escobar Garcia ("Petitioners") are detained by Respondents-Defendants ("Respondents") at Farmville Detention Center ("Farmville"), a private immigration detention facility located in Farmville, VA. Petitioners seek relief from this Court because their detention has become unreasonably prolonged and/or they are at imminent risk of serious illness or death from COVID-19.

There is currently an active, uncontrollable COVID-19 outbreak at Farmville. As of July 7, 267 detained people and 22 employees had tested positive for COVID-19. The declarations submitted in this case—both petitioners' and Director Crawford's—paint a chilling picture of the critical level the outbreak has reached, with detained individuals developing dangerously high fevers and passing out in their dorms, at least six individuals hospitalized, and many more exhibiting severe COVID-19 symptoms including coughing, fever, difficulty breathing, chest pain, and diarrhea. Yet Respondents continue to detain medically vulnerable people at the facility and have taken inadequate steps to protect them from harm. It is impossible for Petitioners to socially distance, as they live in close proximity to others and share communal spaces. Respondents also continue to recklessly endanger the lives of Petitioners by accepting mass transfers from out of state, including from facilities in Arizona and Florida with active COVID-19 outbreaks.

Petitioners—two of whom have been detained for an unreasonable period of time of nearly two years or longer without a bond hearing—are all either over the age of 50 or have underlying medical conditions that render them especially vulnerable to serious complications or death from COVID-19. Keeping them detained during a massive outbreak of a lethal virus for which there is no known vaccine, treatment, or cure is "so grave that it violates contemporary standards of

1

decency to expose anyone unwillingly to such a risk" and violates their constitutional rights. *Helling v. McKinney,* 509 U.S. 25, 36 (1993). This Court's immediate action is necessary to protect their lives and safety.

## FACTUAL BACKGROUND

### I.      Mr. Lizama Gutierrez and Mr. Victor Quintanilla Gallegos's Prolonged Detention

Mr. Lizama Gutierrez is a native and citizen of El Salvador. *See* Corrected Pet. for Writ of Habeas Corpus and Mandamus and Compl. for Injunctive and Declaratory Relief ¶ 26, ECF No. 6 ("Petition" or "Pet."). He first entered the United States as an unaccompanied minor, without inspection on or around August 21, 2014. *Id*. He fled El Salvador after the MS-13 gang tried to recruit him multiple times and, when he refused each time, attacked him and threatened to kill him and his family. *Id.* On or around August 7, 2018, ICE took Mr. Lizama Gutierrez into custody at Farmville, following a single conviction for possession of marijuana (VA. Code § 18.2-250.1). *Id*. ¶ 31. He received no jail time for the conviction. *Id*. ¶ 32. Mr. Lizama Guttierez has been detained at Farmville since then, for almost two years. He remains detained without a hearing to determine the necessity of his prolonged detention and has now spent over 10 percent of his life in ICE custody for a minor conviction for which he received no jail time. *See id*. ¶¶ 26-38.

Mr. Quintanilla Gallegos is a native and citizen of Mexico. *Id*. ¶ 39. He has resided in the United States for over 40 years—since 1979, when he first entered as a Lawful Permanent Resident. *Id*. In or around 2006, an immigration judge granted Mr. Quintanilla Gallegos cancellation of removal, allowing him to maintain his status as a Lawful Permanent Resident. *Id*. ¶ 40. In or around 2011, an immigration judge administratively closed his removal proceedings. *Id*. In or around May 2018, ICE moved to reopen his removal proceedings based on a 2016 constitutionally infirm New Mexico conviction. *Id*. ICE detained Mr. Quintanilla Gallegos in

March 2018, *see* ECF No. 16-1, Jackson Dec. ¶ 32: he was held in Texas for about a year and then transferred to Farmville in the spring of 2019. Pet. ¶ 40. He has been subject to mandatory detention[1] throughout his approximately 27 months of detention.[2] *Id.* An immigration judge deemed Mr. Quintanilla Gallegos incompetent pursuant to *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011) and appointed him an immigration attorney. *Id.* ¶ 41. Since that time, Mr. Quintana Gallegos has been pursuing post-conviction relief that would allow him to retain his Lawful Permanent Resident status. *See id.* ¶¶ 39-41; Ex. 11, Quintanilla Gallegos Post-Release Plan.

## II.    The COVID-19 Pandemic and Petitioners' Vulnerabilities

The COVID-19 pandemic is the worst the world has seen since 1918. The United States has the highest number of confirmed COVID-19 cases and deaths (respectively over 3.2 million and 134,000) in  the world.[3] As of July 10, the state of Virginia has had over 70,000 cases, over 6,700 hospitalizations, and nearly 2,000 deaths due to COVID-19.[4] While the "stay-at-home" order instituted by the Governor of Virginia in March has expired, certain restrictions, such as required face coverings inside public settings, remain in force.[5] Ex. 10, Gupta Dec. ¶ 10-11. The state has

---

[1] The parties agree that Mr. Quintanilla Gallegos is detained pursuant to § 1226(c), *see* ECF No. 16 at 4, ECF No. 16-1, Jackson Dec. ¶ 32, Pet. ¶ 40. Respondents, however, claim he was provided a bond hearing on July 10, 2018, where the Immigration Judge ("IJ") denied bond. ECF No. 16-1, Jackson Dec. ¶ 35. Even if Mr. Quintanilla Gallegos had been provided a bond hearing in 2018, his liberty interest now, after *two additional years* of detention, clearly outweighs the government's interest in detaining him, and Mr. Quintanilla Gallegos is entitled to an immediate bond hearing. *See Rodriguez v. Robbins*, 804 F.3d 1060, 1089 (9th Cir. 2015), *rev'd on other grounds sub nom. Jennings v. Rodriguez*, 138 S Ct. 830 (2018) (finding serious due process concerns in the prolonged detention of individuals denied bond under 1226(a)).

[2] Petitioners mistakenly stated in certain parts of the Petition that Mr. Quintanilla Gallegos had only been detained for 14 months. In fact, he has been detained for approximately 27 months.

[3] World Health Organization Coronavirus Disease (COVID-19) Dashboard (accessed July 13, 2020), https://covid19.who.int/.

[4] Virginia Department of Health, COVID-19 Daily Dashboard (accessed July 13, 2020), https://www.vdh.virginia.gov/coronavirus/covid-19-daily-dashboard/.

[5] Virginia Governor, *Governor Northam Announces Face Covering Requirement and Workplace Safety Regulations* (May 26, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/may/headline-857020-en.html.

also seen an increase in the number of cases following the easing of public health restrictions. *Id.* ¶ 13.

COVID-19 is a highly contagious disease transmitted through respiratory droplets and surface contamination. Mounting evidence suggests the virus also spreads through airborne microdroplets that are capable of traveling beyond six feet.[6] Ex. 10, Gupta Dec. ¶ 28. There is no vaccine to protect against COVID-19 and no approved medication to prevent or treat infection from the virus. Ex. 9, Greifinger Dec. ¶ 4. While social distancing and vigilant hygiene can help prevent COVID-19 infection, *id.* ¶¶ 4, 9, recent evidence suggests that hygiene and distancing alone cannot prevent transmission of COVID-19 through airborne droplets, particularly in indoor congregate settings. Ex. 10, Gupta Dec. ¶ 28.

COVID-19 can result in death and severe damage to organs with potentially prolonged recovery periods. Ex. 9, Greifinger Dec. ¶¶ 4-7. Providing the required care and support for COVID-19 complications is especially difficult in a detention setting. *See id.* ¶¶ 10-16.[7] People can be asymptomatic yet carry and spread COVID-19. *Id.* ¶ 4. People who are detained or incarcerated are exponentially more likely to be infected with and die from COVID-19.[8] Individuals over 50 years old and those with certain medical conditions face greater chances of

---

[6] World Health Organization, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions.

[7] Centers for Disease Control and Prevention, "Clinical Presentation" Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) (June 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

[8] Alexandra Sternlicht, *Prisoners 550% More Likely To Get COVID-19, 300% More Likely To Die*, New Study Shows, Forbes (July 8, 2020), https://www.forbes.com/sites/alexandrasternlicht/2020/07/08/prisoners-550-more-likely-to-get-covid-19-300-more-likely-to-die-new-study-shows/#6b256efd3a72.

serious illness or death from COVID-19.[9] *Id*. ¶¶ 6-8.

Petitioners are four individuals detained at Farmville who, due to their age or underlying medical conditions, are particularly vulnerable to serious illness or death if they contract COVID-19. Ex. 10, Gupta Dec. ¶ 30.

- **Rodrigo Lizama Gutierrez**. Mr. Lizama Gutierrez suffers from frequent and recurring chronic respiratory infections.[10] He is critically vulnerable to serious illness or death from COVID-19 because of his medical conditions. Ex. 10, Gupta Dec. ¶ 30.a.

- **Victor Quintanilla Gallegos**. Mr. Quintanilla Gallegos is 51 years old, and suffers from coronary artery disease, hypertension, and other medical conditions. Ex. 2, Quintanilla Gallegos Dec. ¶¶ 1-2, 7-12. He is critically vulnerable to serious illness or death from COVID-19 because of his age and health conditions. Ex. 10, Gupta Dec. ¶ 30.b.

- **Enrique Palomares Reyes**. Mr. Palomares Reyes is a 52-year-old native and citizen of Mexico. Ex. 4, Palomares Reyes Dec. ¶ 1. He suffers from high blood pressure and other medical conditions. *Id*. ¶¶ 2, 9-15. He is critically vulnerable to serious illness or death from COVID-19 because of his age and health conditions. Ex. 10, Gupta Dec. ¶ 30.c.

- **Rafael Escobar Garcia**. Mr. Escobar Garcia is 61-year-old native and citizen of Guatemala. Ex. 5, Escobar Garcia Dec. ¶ 1. He suffers from high blood pressure. *Id*. ¶ 2. He is critically vulnerable to serious illness or death from COVID-19 because of his age and underlying medical condition. Ex. 10, Gupta Dec. ¶ 30.d.

## III.     Outbreak at Farmville Detention Center

Farmville is currently experiencing a severe COVID-19 outbreak, with at least 267 confirmed cases within a detained population of approximately 350-400. ECF 13-1, Crawford Dec.

---

[9] CDC data shows that of persons whose chronic illness was known, 94% of those who have died had an underlying condition and 78% of those who have required admission to an intensive care unit have had an underlying condition. Joel Achenbach and William Wan, *New CDC Data Shows Danger of Coronavirus for Those With Diabetes, Heart or Lung Disease, Other Chronic Conditions*, Washington Post (Mar. 31, 2020), https://www.washingtonpost.com/health/new-cdc-data-on-underlying-health-conditions-in-coronavirus-patients-who-need-hospitalization-intensive-care/2020/03/31/0217f8d2-7375-11ea-85cb-8670579b863d_story.html.

[10] *See* Report of Kate Sugarman, MD at 3, Pet. Ex. E. He has also been diagnosed with Post-Traumatic Stress Disorder, Major Depressive Disorder, and medically severe Generalized Anxiety Disorder. *See* Report of Susan Osofsky, MSW, LCSW at 4, Pet. Ex. F; Report of Rahul P. Vasireddy, MD, and Shawn S. Sidhu, M.D., FAPA, DFAACAP at 7, Pet. Ex. G.

¶¶ 44-45. Twenty-two employees have also tested positive for COVID-19, and only seven have tested negative. ECF 13-1, Crawford Dec. ¶ 45. This spike in cases coincides with mass transfers of individuals from facilities with COVID-19 outbreaks into Farmville. In early June, ICE transferred 74 individuals, who were not tested prior to transfer, to Farmville from COVID-19 hot spots in Arizona and Florida "due to an operational need." After evidence of an outbreak began to be apparent, the facility began to test those individuals for COVID-19, revealing 51 confirmed cases. ECF No. 13-1, Crawford Dec. ¶¶ 28-29.[11] The facility originally insisted that the cases were confined to the recent transfers, but it quickly became apparent that the entire facility had become exposed and was experiencing an uncontrolled outbreak. The rise in positive cases confirm that "proactive measures to prevent the possible spread of COVID-19" have either not been taken or are patently not effective. ECF No. 16 at 9. In fact, ICE's practice of transferring detained individuals between facilities has fueled outbreaks throughout the country,[12] and ICE was well aware of the unconscionable risk ongoing transfers poses to those who are detained.

Petitioners and others detained at Farmville have also reported devastating conditions with large numbers of people exhibiting COVID-19 symptoms, including serious coughs, fevers, difficulty breathing, chest pain, diarrhea, and vomiting, and not being provided adequate medical care. *See* Ex. 1, Warmeling Dec. ¶¶ 9-17, 35-50; Ex. 2, Quintanilla Gallegos Dec. ¶¶ 11-22, 29-

---

[11] Jenny Gathright, *Cases Spike At Virginia ICE Detention Facility After Transfers From COVID-19 Hotspots*, NPR (June 29, 2020), https://www.npr.org/local/305/2020/06/29/884735646/cases-spike-at-virginia-i-c-e-detention-facility-after-transfers-from-c-o-v-i-d-19-hotspots;      Priscilla Alvarez, *Immigrant Detainees Describe Deteriorating Conditions as Coronavirus Spreads in Facilities*, CNN (June 27, 2020), https://www.cnn.com/2020/06/27/politics/ice-custody-coronavirus/index.html.
[12] Lisa Riordan Seville and Hannah Rappleye, *ICE Keeps Transferring Detainees Around the Country, Leading to COVID-19 Outbreaks*, NBC News (May 31, 2020), https://www.nbcnews.com/politics/immigration/ice-keeps-transferring-detainees-around-country-leading-covid-19-outbreaks-n1212856.

31, 34-36; Ex. 3, Palomares Reyes Dec. ¶¶ 5-8; Ex. 4, Escobar Garcia Dec. ¶¶ 7-8; Ex. 5, Toure Dec. ¶¶ 3-9; Ex. 6, Bolanos Hernandez Dec. ¶¶ 4-7; Ex. 7, Perez Garcia Dec. ¶ 3-19. One individual reported having a fever of over 105 degrees. Ex. 1, Warmeling Dec. ¶ 9. Another person said he was refused a test for several days, given only two Tylenol, and told there was nothing else that could be done for him. Ex. 5, Toure Dec. ¶ 5. Many individuals have passed out, at least six people have been hospitalized, and others have been placed in isolation and ignored, or worse. Ex. 2, Quintanilla Gallegos Dec. ¶ 15; *see also* Ex. 1, Warmeling Dec. ¶ 11 (describing at least three people who passed out, two of whom had to be escorted out in a wheelchair); ECF No. 13-1, Crawford Dec. ¶¶ 38-40, 43 (one person "passed out while standing for count" and over the course of a single weekend, six detained people passed out);  Ex. 7, Perez Garcia Dec. ¶¶ 7-18 ("I screamed for help . . . for about ten minutes until I was physically exhausted").

Several dorms in the facility have been and currently are under quarantine, and individuals with symptoms are being held in the same dorms as individuals with no symptoms. Ex. 1, Warmeling Dec. ¶ 11; Ex. 2, Quintanilla Gallegos Dec. ¶¶ 13-14; Ex. 3, Palomares Reyes Dec. ¶¶ 5-6; Ex. 4, Escobar Garcia Dec. ¶ 6; *see* Ex. 9, Greifinger Dec. ¶¶ 21, 22, 25. With such large numbers of people testing positive for COVID-19 and requiring immediate medical assistance, it is impossible for Farmville to adequately care for the medical needs of those detained, especially those who are at high-risk of severe illness or death. *See* ECF No. 13-1, Crawford Dec. ¶¶ 3.i., 19 (Farmville has only nine rooms approved by the CDC for isolation, and is unable to "quarantine all intakes in blanket fashion in the event of a large influx of transferees").

In addition to failing to protect detained individuals, Farmville has retaliated against individuals who tried to peacefully protest the lack of medical care and inadequate conditions. *See* Ex. 8, Rivera Rodriguez Dec. ¶¶ 4-11; Ex. 2, Quintanilla Gallegos Dec. ¶¶ 18-20; Ex. 3, Palomares

Reyes Dec. ¶ 8; Ex. 4, Escobar Garcia Dec. ¶ 8. Guards at Farmville used force on multiple occasions against detained individuals.[13] Ex. 1, Warmeling Dec. ¶¶ 20-25; Ex. 6, Bolanos Hernandez Dec. ¶¶ 7-10; ECF No. 13-1, Crawford Dec. ¶¶ 32, 42. Following one incident, for approximately 15 hours, Respondents did not allow people detained in Dorm 1 to speak to any people outside the facility, including lawyers. Ex. 1, Warmeling Dec. ¶¶ 26-34; Ex. 6, Bolanos Hernandez Dec. ¶ 10.

## IV.   Respondents' Inability to Protect Petitioners

While Respondents have instituted some measures to respond to the threat of COVID-19, those measures have predictably fallen short because of the highly contagious nature of the disease, the lack of personal protective equipment (PPE), the lack of testing, the confined and congregate nature of the detention setting, and the lack of medical infrastructure at Farmville.[14] The lack of precautionary measures and the reckless ongoing transfers into Farmville introduced COVID into the facility; and once COVID was introduced, it became virtually impossible to contain.

Because of ICE and Farmville's failure to protect them, Petitioners are now at severe risk of continued exposure to COVID-19. While Respondents point to some measures taken to control the spread, improve cleanliness, and promote hygiene, these measures have been insufficient and

---

[13] *See* Spencer Ackerman, *Detainees Say ICE Fired on Them During Coronavirus Protest*, June 30, 2020, The Daily Beast (June 30, 2020), https://www.thedailybeast.com/detainees-say-ice-fired-on-them-during-coronavirus-protest.

[14] In *Toure v. Hott*, a case Respondents rely on throughout their opposition, Judge Liam O'Grady denied a motion for a temporary restraining order or preliminary injunction filed in April 2020 by nine individuals detained in Virginia who are medically vulnerable to COVID-19. Judge O'Grady incorrectly observed that Farmville had "adequately and successfully protected Plaintiffs." *Toure v. Hott*, No. 1:20-cv-395, 2020 WL 2092639 at *13 (E.D. Va. Apr. 29, 2020), *appeal docketed*, No. 20-6695 (4th Cir. May 13, 2020). He reasoned that "Farmville's success is most apparent, because it has returned no positive COVID-19 tests." *Id*. Unfortunately, the current uncontrolled COVID-19 outbreak at Farmville confirms the clearly erroneous nature of that conclusion. Because of the ongoing transfers and the facility's inadequate response to contain the spread of COVID-19, the disease is now rampant within the facility.

inconsistently implemented. Social distancing remains impossible because people are housed together in groups and there are many shared spaces throughout the facility. Ex. 1, Warmeling Dec. ¶¶ 4, 6-7; Ex. 2, Quintanilla Gallegos Dec. ¶ 11; Ex. 3, Palomares Reyes Dec. ¶ 3; Ex. 4, Escobar Garcia Dec. ¶ 3; *see also* Ex. 9, Greifinger Dec. ¶¶ 18-20. The only measure Farmville has taken or can take is to "encourage[e] all detainees to engage in social distancing." ECF No. 16 at 8. But that is clearly not possible in the dorms, and in any event is insufficient in light of evidence that airborne transmission may exceed six feet. *See* Ex. 10, Gupta Dec. ¶ 28.

Moreover, people held in different dorms are indirectly exposed to one another due to constant movement of individuals within the facility: guards and facility staff go in and out of the dorms and detained individuals come into contact with individuals from other dorms when they visit the medical unit or perform labor, such as kitchen duties. *See* Ex. 1, Warmeling Dec. ¶¶ 19, 52; Ex. 2, Quintanilla Gallegos Dec. ¶ 14; Ex. 6, Bolanos Hernandez Dec. ¶ 7; *see also* Ex. 9, Greifinger Dec. ¶¶ 11, 22. Facility staff, who arrive and leave on a shift basis, receive temperature checks and self-report symptoms but are not comprehensively tested for COVID-19.[15] Similarly, individuals transferred by ICE to Farmville from COVID-19 hot spots are not tested prior to transfer or upon arrival. ECF No. 13-1, Crawford Dec. ¶ 28. As the current situation clearly illustrates, these measures have been insufficient, and more widespread testing was implemented too late to have any meaningful mitigating effect.

Farmville is also ill-equipped to manage a COVID-19 outbreak in key respects. It has very limited on-site medical facilities and a very small number of isolation units. Ex. 1, Warmeling Dec. ¶ 5; ECF No 13-1, Crawford Dec. ¶¶ 3.i., 19. There is insufficient PPE. Individuals have only

---

[15] U.S. Immigration and Customs Enforcement - Enforcement and Removal Operations, *COVID-19 Pandemic Response Requirements* at 17 (June 22, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

received one or two masks over the past month, with no replacements if the masks are lost or dirty and no ability to wash them. Ex. 1, Warmeling Dec. ¶ 10; Ex. 2, Quintanilla Gallegos Dec. ¶ 12; Ex. 3, Palomares Reyes Dec. ¶ 4; Ex. 4, Escobar Garcia Dec. ¶ 5; *see* ECF No. 13-1, Crawford Dec. ¶¶ 26, 37 (noting distribution of two N95 masks per person in April, an additional N95 mask more than two months later in June, and two cloth and surgical masks on an unknown date).

ICE has been on notice of these deficiencies yet has refused to change its practices. The Office of the Inspector General ("OIG") of the Department of Homeland Security ("DHS") recently issued a report on ICE detention facilities' COVID-19 response and noted similar concerns in such facilities across the country, including inability to practice social distancing among detained population and staff; inability to isolate or quarantine individuals who may be infected with COVID-19; decreases in current staff availability due to COVID-19, as more staff test positive for the virus; transfers of detained people between facilities; and availability of PPE.[16]

As a result of these inadequacies, Respondents cannot reliably prevent the spread of the virus in their detention facilities. As public health experts have repeatedly stated, the only viable strategy to protect the health and safety of those in detention and the surrounding communities is to release those who are most medically vulnerable. Two medical experts for DHS sent a warning to the agency in February that keeping people detained poses "an imminent risk to the health and safety of immigration detainees" and to the general public.[17] *See also* Ex. 9, Greifinger Dec. ¶ 31. Releasing the most vulnerable people, such as Petitioners, would also reduce the burden on

---

[16] Department of Homeland Security Office of Inspector General, *Early Experiences with COVID-19 at ICE Detention Facilities* (June 18, 2020), https://www.oig.dhs.gov/reports/2020/early-experiences-covid-19-ice-detention-facilities/oig-20-42-jun20 (hereinafter, "OIG COVID Report")

[17] Letter from Dr. Scott Allen and Dr. Josiah Rich, Medical Experts for DHS, to House Comm. on Homeland Sec. (Mar. 19, 2020), https://assets.documentcloud.org/documents/6816336/032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.pdf.

Farmville's limited health care infrastructure as well as regional hospitals and health centers. *Id.* ¶ 33; Ex. 10, Gupta Dec. ¶¶ 13-17; *see* Ex. 2, Quintanilla Gallegos Dec. ¶¶ 22-28, 34 (Mr. Quintanilla Gallegos had to be hospitalized twice in four days); ECF No. 13-1, Crawford Dec. ¶¶ 43 (noting six cases of transfers to nearby hospitals due to COVID-19 complications).

Despite these warnings, ICE has failed to release vulnerable individuals like Petitioners from its detention facilities. As a result, numerous courts across the country have recognized the heightened risk to individuals in immigration detention and have ordered their release.[18]

## ARGUMENT

### I.     The Prolonged Detention of Petitioners Mr. Lizama Gutierrez[19] and Mr.

---

[18] *See Malam v. Adducci*, No. 5:20-cv-10829 (JEL) (APP), 2020 WL 3512850 (E.D. Mich. June 28, 2020); *Dada v. Witte*, No. 20-cv-458 (DDD) (JPM), 2020 WL 2614616 (W.D. La. May 22, 2020); *Barbecho v. Decker*, No. 20-cv-2821 (AJN), 2020 WL 2513468 (S.D.N.Y. May 15, 2020); *Prieto Refunjol v. Adducci*, No. 20-cv-2099 (SDM), 2020 WL 2487119 (S.D. Ohio May 14, 2020); *Santiago P. v. Decker*, No. 20-cv-5067 (KM), 2020 WL 2487648 (D.N.J. May 14, 2020); *Juan E.M. v. Decker*, No. 2:20-cv-04594 (KM), 2020 WL 2214586 (D.N.J. May 7, 2020); *Coreas v. Bounds*, No. 20-cv-780 (TDC), 2020 WL 2292747 (D. Md. May 7, 2020); *Medeiros v. Martin*, No. 20-cv-178 (WES), 2020 WL 2104897 (D.R.I. May 1, 2020); *Coreas v. Bounds*, No. 8:20-cv-00780 (TDC), 2020 WL 2201850 (D. Md. Apr. 30, 2020); *Pimentel-Estrada v. Barr*, No. 2:20-cv-00495 (RSM) (BAT), 2020 WL 2092430 (W.D. Wash. Apr. 28, 2020); *Prieto Refunjol v. Adducci*, No. 2:20-cv-02099 (SDM) (CMV), 2020 WL 1983077 (S.D. Ohio Apr. 27, 2020); *Chavez Garcia v. Acuff*, No. 20-cv-357 (NJR), 2020 WL 1987311 (S.D. Ill. Apr. 27, 2020); *Ferreyra v. Decker*, No. 20-cv-3170 (AT), 2020 WL 1989417 (S.D.N.Y. Apr. 27, 2020); *Essien v. Barr*, No. 20-cv-1034 (WJM), 2020 WL 1974761 (D. Colo. Apr. 24, 2020); *Sallaj v. ICE*, No. 20-cv-167 (JJM), 2020 WL 1975819 (D.R.I. Apr. 24, 2020); *Durel B. v. Decker*, 2:20-cv-3430 (KM), Dkt. No. 34 (D.N.J. Apr. 21, 2020); *Zaya v. Adducci*, 5:20-cv-10921 (JEL) (APP), Dkt. No. 9 (E.D. Mich. Apr. 18, 2020); *Amaya-Cruz v. Adducci*, 1:20-cv-00789 (DAP), Dkt. No. 35 (N.D. Ohio Apr. 18, 2020); *Vazquez Barrera v. Wolf*, 4:20-cv-01241, Dkt. No. 41 (S.D. Tex. Apr. 17, 2020); *Wright v. Anderson*, 20-cv-3704 (BRM), Dkt. No. 22 (D.N.J. Apr. 17, 2020); *J.G. v. Decker*, 20-cv-3644 (KM) (D.N.J. Apr. 15, 2020); *Fofana v. Albence*, 20-cv-10869 (GAD), Dkt. No. 15 (E.D. Mich. Apr. 14, 2020); *Ixchop Perez v. Wolf*, 19-cv-5191 (EJD), Dkt. No 29 (C.D. Cal. Apr. 14, 2020); *Doe v. Barr*, 20-cv-2141 (LB), Dkt. No. 27 (N.D. Cal. Apr. 12, 2020); *Bent v. Barr*, 19-cv-06123 (DMR), 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020); *see also* Pet. ¶ 147 (collecting other cases); *but see*, *Toure v. Hott*, No. 1:20-cv-395, 2020 WL 2092639 (E.D. Va. Apr. 29, 2020).

[19] Petitioners agree that Claim III is now moot, as the Board of Immigration Appeals ("BIA") finally granted Mr. Lizama Gutierrez's Motion to Reconsider ("MTR") after the filing of this litigation. Similarly, Claim II, which relates to the question of which statute governs his detention, is now also moot as Respondents have conceded that Mr. Lizama Gutierrez is detained under 8

**Quintanilla Gallegos Without a Bond Hearing Violates Due Process, and They Are Each Entitled to an Immediate Bond Hearing.**

Mr. Lizama Gutierrez's and Mr. Quintanilla Gallegos's prolonged detention without a bond hearing violates each of their constitutional right to procedural due process.[20] They request immediate release or a bond hearing within five business days.

Noncitizens detained under 8 U.S.C. § 1226(c) are entitled to due process protections. *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). This Court and others in this district have held that due process requires a hearing for noncitizens subject to unreasonably prolonged mandatory detention pending removal proceedings.[21]

The five-factor test this Court laid out in *Portillo v. Hott* weighs strongly in favor of Petitioners' right to an immediate bond hearing: (1) the duration of the detention, including the anticipated time to completion of the noncitizen's removal proceedings; (2) whether the civil detention exceeds the criminal detention for the underlying offense; (3) dilatory tactics employed in bad faith by parties or adjudicators; (4) procedural or substantive legal errors that significantly extend the duration of detention; and (5) the likelihood that the government will secure a final removal order. This Court has also recognized as relevant factors the COVID-19 pandemic, *see*

---

U.S.C. § 1226 *See* ECF No. 16 at 12 ("In *Zadvydas,* the Court addressed post-removal-proceeding-but-pre-removal detention under 8 U.S.C. § 1231(a)(6)—not applicable to either Lizama Gutierrez or Quintanilla Gallegos. . .").

[20] Respondents appear to misread Petitioners' arguments as asserting a statutory prolonged detention claim under the Immigration and Nationality Act, but Petitioners have not asserted such a claim, which is clearly foreclosed by *Jennings v. Rodriguez*, 138 S Ct. 830 (2018). Instead, Petitioners here argue that their prolonged detention violates their *constitutional* right to procedural due process—a question left open by *Jennings* and which this Court has resolved in petitioners' favor multiple times.

[21] *See Urbina v. Barr*, No. 1:20-cv-325, 2020 WL 3002344, at *5 (E.D. Va. 2020); *Bah v. Barr*, 409 F. Supp. 3d 464, 470 (E.D. Va. 2019); *Portillo v. Hott*, 322 F. Supp. 3d 698, 706 (E.D. Va. 2018); *Mauricio-Vasquez v. Crawford*, No 1:16-cv-01422, 2017 WL 1476349 (E.D. Va. Apr. 24, 2017); *Haughton v. Crawford*, No. 1:16-cv-634, 2016 WL 5899285, at *6 (E.D. Va. Oct. 7, 2016); *see also Obando-Segura v. Whitaker*, No. GLR-17-3190, 2019 WL 423412 (D. Md. Feb. 1, 2019); *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 710 (D. Md. 2016).

*Urbina*, 2020 WL 3002344, at \*7, and whether civil detention mirrors the "jail-like" conditions that criminal defendants face. *See Haughton*, 2016 WL 5899285, at \*8 n.3 (stating that similarities may be "probative of reasonableness," but declining to reach the question).

The first *Portillo* factor, the duration of detention, is "the most important" factor and given significant weight. *Portillo*, 322 F. Supp. 3d at 707 (internal quotations omitted). At the six-month mark, detention becomes, at the very least, increasingly suspect. *See Demore*, 538 U.S. at 529-30. At 22 months and 27 months respectively, the duration of Mr. Lizama Gutierrez's and Mr. Quintanilla Gallegos's detention is unconstitutionally prolonged. The length of Petitioners' detention "weighs heavily in [their] favor as a prolonged and substantial burden on [their] liberty interest," and is "significantly longer than the one-, five-, and six-month boundaries described in *Zadvydas* and *Demore*." *Portillo*, 322 F. Supp. 3d at 708 (holding plaintiff's 14-month detention was unreasonable). In the absence of the opportunity for release on bond, Petitioners may well face many more months of detention. Following a delay of almost a year, the BIA has finally granted Mr. Lizama Gutierrez's Motion to Reconsider ("MTR"), and he is only now beginning the appeal process he attempted to initiate in June 2019. Mr. Quintanilla Gallegos's efforts to secure post-conviction relief in the New Mexico state court system are also ongoing.

The second factor—whether the length of the civil detention exceeds the criminal incarceration for the underlying crime—also weighs heavily in favor of Mr. Lizama Gutierrez and Mr. Quintanilla Gallegos. Neither Petitioner received jail time for his convictions, but they have been detained in ICE custody for nearly *two years* or longer.

With respect to the third factor, both Petitioners have acted in good faith. Mr. Lizama Gutierrez has diligently pursued relief: the delays in his removal proceedings stem from the BIA's erroneous denial of his appeal and its failure to adjudicate his MTR for more than 10 months. Mr.

Lizama Gutierrez has taken proactive measures to advance his proceedings: he filed a joint motion to expedite the BIA's ruling on his MTR, Pet. ¶ 37, his attorney regularly followed up with the BIA regarding the status of his MTR, *id.*, and he filed the instant lawsuit for a writ of mandamus to compel the BIA to review his MTR.[22] Mr. Quintanilla Gallegos has also been diligent in pursing relief. While he has sought continuances to allow him to pursue relief to which he is entitled and to allow his attorney time to prepare his case, ECF No. 16 at 5, Mr. Quintanilla Gallegos has at all times acted in good faith. Courts may not "penalize an alien's exercise of his legal rights" and a decision "to explore avenues of relief that the law makes available to him does not mitigate the Due Process concerns created by his lengthy detention." *Bah*, 409 F. Supp. 3d at 471-472.

The fourth factor—procedural or substantive legal errors that significantly extend the duration of detention—is relevant in Mr. Lizama Gutierrez' case. In July 2019, the BIA dismissed Mr. Lizama Gutierrez' timely appeal because it was mistaken about the date on which the IJ's decision had been mailed to him. Pet. ¶ 36. The BIA did not correct this clerical error until June 2020, and adjudication of Mr. Lizama Gutierrez's appeal has been delayed by a year as a result.

The fifth factor—the likelihood that the government will secure a final removal order— also weighs in the Petitioners' favor. Mr. Lizama Gutierrez fled El Salvador as a minor after gang members violently attacked him on several occasions and threatened to kill him and his family. Pet. ¶¶ 26-27. While an IJ initially denied his request for relief from persecution, the BIA may reverse the IJ's decision given the grave danger Mr. Lizama Gutierrez faces if he returns to El Salvador. Mr. Quintanilla Gallegos also has a viable path to relief. He is an LPR who has lived in

---

[22] Respondents inexplicably suggest that Mr. Lizama Gutierrez should have appealed the BIA's dismissal of his appeal to the Fourth Circuit, *see* ECF No. 16 at 17, even though 8 U.S.C. § 1252(d)(1), which provides for judicial review of removal orders, requires exhaustion of all administrative remedies.

the U.S. for over 40 years. He is seeking to vacate the conviction underpinning his removal proceedings because it was unconstitutionally infirm pursuant to *Padilla v. Kentucky*, 559 U.S. 356 (2010). Both Petitioners are represented by counsel, increasing their chances of success.

Given the current pandemic, "[a]n additional factor of legitimate concern is the threat that COVID-19 currently poses to incarcerated persons as well as the delay that the disease has injected into judicial and administrative proceedings." *Urbina*, 2020 WL 3002344, at *7. In Petitioners' case, the threat posed by COVID-19 has reached a critical level, given Petitioners' medical vulnerabilities coupled with the severe outbreak at Farmville. Petitioners' detention at Farmville undoubtedly mirrors the jail-like conditions of a penal institution, which consequently puts Petitioners' health and safety at greater risk. As described *infra*, Petitioners are housed in crowded dorms and share communal space, making social distancing impossible. They have limited access to fresh air, *see* Ex. 1, Warmeling Dec. ¶ 9, which increases their risk of contracting COVID-19 through airborne microdroplets, *see* Ex. 10, Gupta Dec. ¶ 28. Various dorms, including Mr. Escobar Garcia's dorm, have been placed on quarantine, completely restricting detained individuals' movement. Ex. 1, Warmeling Dec. ¶ 11; Ex. 5, Escobar Garcia Dec. ¶ 6. Guards have used force on multiple occasions against detained individuals. Ex. 1, Warmeling Dec. ¶¶ 20-25; Ex. 8, Rivera Rodriguez Dec. ¶¶ 7-10 (being told officers were unable to find a pulse after tear gas was applied to him); Ex. 6, Bolanos Hernandez Dec. ¶¶ 7-10; ECF No. 13-1, Crawford Dec. ¶¶ 32, 42. The conditions at Farmville, which have become increasing restrictive, have made it impossible for Petitioners to protect themselves during the COVID-19 pandemic, elevating their liberty interests and further diminishing the government's interest in continuing to detain them.

Since Petitioners' prolonged detention without a bond hearing has become unconstitutional, they are entitled to, at the very least, a bond hearing with the burden of proof on

the government to justify continued detention by clear and convincing evidence and with a requirement that the government consider alternatives to detention and their ability to pay bond.[23]

## II.     The Court Has Authority to Order Petitioners' Release as the Sole Effective Remedy for the Constitutional Violation.

Respondents erroneously claim that Petitioners may not seek release to remedy the constitutional violations they are suffering in detention. ECF No. 16 at 20-23; ECF No. 13 at 13-14. Citing *Wilborn v. Mansukhani*, 795 F. App'x 157, 162 (4th Cir. 2019), an unpublished Fourth Circuit decision, they claim that Petitioners may not bring Claims IV-VI through a habeas action. ECF No. 16 at 22; ECF No. 13 at 14. Respondents rely heavily on *Toure v. Hott*, a case in which Judge O'Grady misapplied *Wilborn* to hold that habeas jurisdiction was not available to the petitioners. *Toure v. Hott*, No. 1:20-cv-395, 2020 WL 2092639 at *5-8 (E.D. Va. Apr. 29, 2020), *appeal docketed*, No. 20-6695 (4th Cir. May 13, 2020); *see* ECF No. 13 at 13-14; ECF No. 16 at 23. In reaching that conclusion, however, Judge O'Grady misapprehended the nature of the petitioners' claims—as do Respondents in this case. Contrary to Respondents' assertions, this Court has authority to release Petitioners pursuant to its authority to grant writs of habeas corpus.

Habeas corpus is available if a person is "in custody in violation of the Constitution or laws or treaties of the United States . . . ." 28 U.S.C. § 2241(c)(3). Petitioners are in custody, and they claim their continued confinement violates the Constitution. "Habeas is at its core a remedy for unlawful executive detention." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Petitioners' claim that

---

[23] This Court has repeatedly held that when § 1226(c) becomes unreasonably prolonged, due process requires that the detained individual be afforded a bond hearing where the government bears the burden of justifying continued detention by clear and convincing evidence. *See Portillo*, 322 F. Supp. 3d at 709; *Haughton v. Crawford*, 221 F. Supp. 3d 712, 714 (2016); *Urbina*, 2020 WL 3002344, at *7. As this Court has further pointed out, neither the Supreme Court's holding in *Jennings v. Rodriguez*, 138 S. Ct. 830,  nor the Fourth Circuit's holding in *Guzman Chavez v. Hott*, 940 F.3d 867 (4th Cir. 2019), disturb this caselaw because those cases "focused on the protections required by § 1226(c) and did not reach the constitutional question." *Urbina*, 2020 WL 3002344, at *7 (quoting *Portillo*, 322 F. Supp. 3d at 709 n.9) (internal brackets omitted).

their continued confinement is unconstitutional and that they are entitled to immediate release lies

"within the core of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973). Courts all

over the country, including within the Fourth Circuit, have found that a claim by persons in

immigration detention "seeking release because of unconstitutional conditions or treatment is

cognizable under § 2241." *Coreas v. Bounds*, No. 8:20-cv-00780-TDC, Dkt. No. 56 (D. Md. Apr.

3, 2020).[24]

The unpublished Fourth Circuit decisions cited by Respondents apply only to cases where

*conditions of confinement* are challenged and the remedy sought is *reform of conditions*, not

release. But Petitioners here do not challenge the conditions of their confinement and do not seek

conditions reforms. Instead, Petitioners challenge the *fact* of their confinement in light of COVID-

19 and they seek release from that confinement—a claim that lies "at the core" of habeas corpus.

*Preiser*, 411 U.S. at 487*; see also Lee v. Winston*, 717 F.2d 888, 892 (4th Cir. 1983) (habeas corpus

"is primarily a vehicle for attack by a confined person on the legality of his custody and the

traditional remedial scope of the writ has been to secure absolute release . . . from that custody").

Release is the only effective remedy for the constitutional violation Petitioners face.

Preventive measures have already proven to be insufficient. *See supra* Factual Background,

Sections III-IV. Petitioners continue to live with other people held in close quarters and are unable

to maintain the necessary hygiene and social distancing measures that could protect them from

serious illness or death. Those circumstances render the *fact* of their detention unconstitutional,

---

[24] *See e.g.*, *Malam v. Adducci*, 2:20-cv-10829-JEL-APP, Dkt. No. 23 (E.D. Mich. Apr. 6, 2020) (holding that "where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas."); *Hernandez v. Wolf*, 5:20-cv-00617 (TJH) (KS), Dkt. No. 17 (C.D. Cal. Apr. 1, 2020) (noting that habeas relief is not barred in case of detained immigrant seeking release due to threat from COVID-19 because INA "does not restrict *habeas* jurisdiction for petitions that raise constitutional claims).

and there are no conditions reforms available that would remedy those inadequacies. As several courts have concluded, "[t]he mere fact that Plaintiffs' constitutional challenge requires discussion of conditions in immigration detention does not necessarily bar such a challenge in a habeas petition." *Vazquez Barrera v. Wolf*, No. 4:20-cv-01241, Dkt. No. 41 (S.D. Tex. Apr. 17, 2020).[25] This Court has the authority to order their release, and habeas is the right vehicle for their claims.

This Court may also order Petitioners' release as a form of injunctive relief to redress unconstitutional conditions of confinement. "A district court enjoys wide discretionary authority in formulating remedies for constitutional violations." *Smith v. Bounds*, 813 F.2d 1299, 1301 (4th Cir. 1987); *see Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies"). This principle is well-established. In cases involving prisons and jails, federal courts have repeatedly ordered the release of detained persons when necessary to remedy constitutional violations caused by overcrowding.[26] Even if this remedy is to be granted sparingly as Respondents argue, there is no

---

[25] *See also Dada v. Witte*, No. 1:20-cv-00458, Dkt. No. 17, at 7-16 (W.D. La. Apr. 30, 2020), *report and recommendation adopted in part*, 2020 WL 2614616 (W.D. La. May 22, 2020) (explaining the distinction between fact of confinement and conditions of confinement challenges and concluding that habeas is the correct vehicle for a challenge to the fact of confinement due to the threat COVID-19); *Hernandez v. Wolf*, 5:20-cv-00617 (TJH) (KS), Dkt. No. 17 (C.D. Cal. Apr. 1, 2020) (noting that habeas relief is not barred in similar case because INA "does not restrict *habeas* jurisdiction for petitions that raise constitutional claims"); *Malam v. Adducci*, No. 2:20-cv-10829-JEL-APP, 2020 WL 1672662, at *4 (E.D. Mich., Apr. 6, 2020) (holding that "where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas."). Therefore, Plaintiffs have a cognizable claim under 28 U.S.C. § 2241.

[26] *See, e.g.*, *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of individuals on low-bond pretrial detention as necessary to reach a population cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224-25 (S.D. Ala. 1984) (concluding that district court properly exercised remedial powers to order a prison's population reduced to alleviate unconstitutional

doubt that the Court has the authority to release Petitioners, and the unprecedented facts of the present case warrant release. *See Malam v. Adducci*, No. 2:20-cv-10829-JEL-APP, 2020 WL 1672662, at *4 (E.D. Mich., Apr. 6, 2020) (holding that "the Fifth Amendment provides [detained immigrants challenging their detention during COVID-19] with an implied cause of action, and accordingly 28 U.S.C. 1331 would vest the Court with jurisdiction"). This Court has jurisdiction over Petitioners' claims under 28 U.S.C. § 1331 and may order equitable relief, including release, to remedy the constitutional violations.

### III.   Petitioners' Continued Detention Constitutes Impermissible Punishment.

#### A.  Petitioners, Who Are Civilly Detained, May Not Be Punished.

The constitutional protections that apply to persons detained pursuant to civil immigration laws under the Fifth Amendment are greater than those under the Eighth Amendment. *See Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). Persons who, like Petitioners, are held in civil detention are entitled to "more considerate treatment and conditions of confinement" than persons who are incarcerated because of a criminal conviction. *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209 n.5 (4th Cir. 2017) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).[27]

---

conditions and noting other cases); *Inmates of the Allegheny Cty. Jail v. Wecht*, 565 F. Supp. 1278, 1297 (W.D. Pa. 1983) (order to reduce overcrowding "is within our power to correct the constitutional violations"); *Brenneman v. Madigan*, 343 F. Supp. 128, 139 (N.D. Cal. 1972) ("If the state cannot obtain the resources to detain persons . . . in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons."). Although these cases precede the Prison Legal Reform Act, which altered the landscape for cases seeking release in the criminal detention context, the PLRA has no application to immigration detention, and these cases still provide persuasive authority applicable to this case.

[27] *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977))). Contrary to Respondent Crawford's assertion that persons in immigration detention enjoy fewer constitutional protections, *see* ECF No. 13 at 15, courts have consistently held that persons in immigration detention must be afforded *at least* the same conditions as those held in other forms of civil detention. *See e.g.*, *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v.*

The Eighth Amendment, which applies to persons convicted of criminal offenses, allows punishment as long as it is not cruel and unusual, but the Fifth Amendment's due process protections do not allow punishment at all. *Bell v. Wolfish*, 441 U.S. 520, 536-37 n.16 (1979); (*Nelson v. Collins*, 659 F.2d 420, 425 (4th Cir. 1981).

To establish that a particular condition of detention constitutes impermissible punishment, a petitioner must show either (1) an express intent to punish; or (2) a lack of a reasonable relationship to a legitimate governmental purpose, from which an intent to punish may be inferred. *See Wolfish*, 441 U.S. at 538; *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). Absent an explicit intent to punish, a court "must evaluate the evidence and ascertain the relationship between the actions taken against the detainee and the custodian's supporting rationale." *Williamson v. Stirling*, 912 F.3d 154, 178 (4th Cir. 2018). "That inquiry turns on whether the actions taken may validly be attributed to an alternative, nonpunitive rationale, and whether they appear 'excessive in relation to the alternative purpose assigned.'" *Id*. (citations omitted).

### B. Petitioners' Confinement Constitutes Punishment Because It Is Not Reasonably Related to a Legitimate Government Purpose.

Petitioners' detention at risk to their lives is clearly excessive of any legitimate interest Respondents have in their confinement in the midst of a deadly COVID-19 outbreak. ECF No. 16

---

*Kelly*, 878 F.3d 710 (9th Cir. 2017); *Charles v. Orange Cty.*, 925 F.3d 73 (2d Cir. 2019). Courts have disagreed, however, on whether persons in civil detention are entitled to greater protections than individuals in criminal pre-trial detention. *Compare E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019) (noting that the legal rights of those in immigration detention are analogous to those in pretrial detention), *with King v. Cty. of Los Angeles*, 885 F.3d 548, 552 (9th Cir. 2018) (finding unconstitutional treatment where conditions in civil detention are similar to pre-trial criminal detention). The Fourth Circuit has not yet addressed this issue. Because Petitioners are detained civilly while awaiting adjudication of their removal proceedings, they are entitled to a more lenient standard. *See Unknown Parties*, 2016 WL 8188563, at *5. Petitioners also, at a minimum, succeed under the pretrial detention standard recognized by the Fourth Circuit as sufficient to establish a due process violation. Thus, under either standard, Petitioners have established a likelihood of success on the merits of their due process claim.

at 25-26. Immigration detention primarily serves to ensure that the individuals do not endanger the community, appear at their immigration hearings, and comply with final removal orders. See 8 C.F.R. § 1236.1(c)(8); *see also Matter of Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006).

As set forth previously, each Petitioner suffers from underlying health conditions or age that make them especially susceptible to severe illness or death from COVID-19. Farmville is not equipped to take adequate measures that would prevent them from contracting COVID-19. By holding Petitioners in conditions where they are unable to take the necessary precautions against infection, Respondents' actions dramatically increase their exposure to COVID-19, serious illness, or death. In *Zadvydas*, the Supreme Court explained that "[t]here is no sufficiently strong special justification . . . for indefinite civil detention" of immigrants. *Zadvydas*, 533 U.S. at 690. Similar principles apply here. If the government's interest cannot justify indefinite detention, it also cannot justify the "potentially permanent" harm Petitioners here face. *See id.* at 690-91.

None of the "criminal conduct" to which Respondents cite can reasonably form a basis for public safety concerns, especially considering the risk of harm to Petitioners. ECF No. 16 at 27. Petitioners also do not pose a flight risk; and in any event this Court may impose conditions on Petitioners' release that can address any concerns about risk of flight.[28] In light of the many highly effective alternatives to detention readily available to Respondents and the unacceptably high risk to Petitioners' health and safety, that interest cannot justify continued detention. Under these

---

[28] Various alternative to detention ("ATD") programs exist to ensure that individuals in removal proceedings appear at immigration court and comply with their final orders of removal. One of the main ATD programs is ICE's Intensive Supervision Appearance Program ("ISAP"), which employs methods including ankle bracelets, telephone and in-person check-ins, and home visits to monitor individuals. A study by the Government Accountability Office ("GAO") found that 99% of individuals enrolled in the full-service ISAP program appeared for their hearing. GAO, Alternatives to Detention, 30 (Nov. 2014), https://www.gao.gov/assets/670/666911.pdf.

circumstances, the government's decision to detain Petitioners during an active COVID-19 outbreak is clearly excessive in relation to any interest they may have in continued detention.

Finally, Respondents' claim that allowing for release here would be applicable any time there is an outbreak of any contagious illness is hyperbolic and out of touch with the current reality. ECF No. 16 at 26. Respondents cite *Coreas v. Bounds* for this proposition, *see* ECF No. 16 at 26; ECF No. 13 at 17, without acknowledging that the court in *Coreas* subsequently ordered the release of three medically vulnerable individuals from immigration detention under the Fifth Amendment in light of COVID-19. *See Coreas*, No. 20-cv-780 (TDC), 2020 WL 2201850 at *2 (holding that "that the detention of a civil detainee with a high-risk health condition in a facility exposed to the Coronavirus likely imposes unconstitutional punishment because the conditions bear no reasonable relationship to the purpose of the detention."). COVID-19 is not just any contagious illness; it is a highly infectious and life-threatening disease that has no vaccine or cure, and the world has not seen a pandemic of comparable proportions since 1918. Because of the unprecedented nature of this pandemic, entire state economies and countries are shut down. *See supra*, Factual Background Section II. Such measures would not have been warranted for just any "contagious disease." ECF No. 16 at 26. And Petitioners are each medically vulnerable, which makes their risk of severe harm even greater and more imminent than the overall detained population's.

### IV. Respondents Have Acted with Deliberate Indifference to the Risk Petitioners Face from COVID-19.

#### A. Respondents May Not Act with Deliberate Indifference to a Substantial Risk of Harm.

The government has an affirmative duty to provide conditions of reasonable health and safety to the people it holds in its custody. *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). In order to establish a violation of the Eighth Amendment,

convicted persons must show "deliberate indifference" on the part of prison officials. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Although a lesser standard should apply to those in civil detention, they succeed if they can show that their treatment would violate the constitutional rights of those in pretrial detention. The Fourth Circuit has held that a person in pretrial detention necessarily "makes out a due process violation if he shows 'deliberate indifference to serious medical needs' . . . because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent." *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (citation omitted).

In order to show that defendants acted with deliberate indifference to a serious harm, a plaintiff must show that the plaintiff was exposed to a substantial risk of serious harm, and that the defendants knew of or disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837–38 (1994); *Thompson v. Virginia*, 878 F.3d 89, 97-98 (4th Cir. 2017).[29]

### i.   Petitioners Are Exposed to a Substantial Risk of Serious Harm.

For the first prong, a petitioner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or *substantial risk* of injury. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). Such a claim "may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm." *Smith v. Carpenter*, 316

---

[29] Under the Eighth Amendment, the first prong of the deliberate-indifference test is an objective standard while the second is a subjective one. The Supreme Court's holding in *Kingsley v. Hendrickson*, 576 U.S. ___ (2015) suggests that for a Fifth Amendment analysis, the second prong is also objective. However, the Fourth Circuit has not had occasion to rule on this question, and Plaintiffs clearly meet the subjective standard. *See Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133, at *8 (D. Md. Apr. 3, 2020) (noting that "it is sensible, after *Kingsley*, to conclude that a different, less stringent standard should be applied to the claims of pretrial detainees relating to health and safety"); *Coreas v. Bounds*, No. 20-cv-780 (TDC), 2020 WL 2292747 (D. Md. May 7, 2020) (finding subjective deliberate indifference standard to be met where COVID-19 entered an immigration detention facility and defendants had not corrected deficiencies in social distancing, accommodations for medically vulnerable individuals, and testing).

F.3d 178, 188 (2d Cir. 2003); *see Helling v. McKinney*, 509 U.S. 25, 33 (1993) (risk of contracting communicable disease could constitute "unsafe, life-threatening condition").

Respondents do not dispute—nor could they—that Petitioners meet the first prong of the deliberate indifference standard. ECF No. 16 at 28; ECF No. 13 at 19. COVID-19 is unlike any other contagious or communicable disease to which detained persons may be exposed. Ex. 9, Greifinger Dec. ¶¶ 3-5; Ex. 10, Gupta Dec. ¶ 21. Petitioners, due to their age and/or underlying medical conditions, are especially vulnerable to serious illness or death from COVID-19. *Id.* ¶ 30. There is an active COVID-19 outbreak at Farmville, with at least 80% of the detained population and 76% of the staff infected. *Id.* ¶ 29.

Respondents' inadequate response to prevent and contain the spread of COVID-19 has further exacerbated the great risk Petitioners face while detained. Ex. 9, Greifinger Dec. ¶¶ 17-30 ("it is my opinion that Farmville Detention Center cannot protect the lives of medically vulnerable detainees"); *supra* Factual Background, Sections III-IV. ICE's actions and response is exposing detained individuals to an even greater risk of harm than they normally would in a detention setting. Ex. 10, Gupta Dec. ¶ 29 ("the risk individuals detained at Farmville face is far greater than the already elevated risk COVID-19 poses to detained populations in general"). The most egregious example is ICE's reckless transfers of individuals from facilities with active COVID-19 outbreaks into Farmville.[30] ECF No. 13-1, Crawford Dec. ¶¶ 28-29; Ex. 9, Greifinger Dec. ¶ 29.[31]

---

[30] Although the court in *Toure* did not consider these transfers to be particularly concerning, *see Toure*, 2020 WL 2092639 at *10, the Court's conclusions in that case have now been shown to be clearly erroneous. These reckless actions by Respondents, in conjunction with their inability to protect Petitioners from infection, have caused a COVID-19 outbreak at the facility and are placing Petitioners in mortal danger.

[31] *See also* Letter from Senators Mark R. Warner and Tim Kaine to Acting Secretary Wolf (June 26, 2020), https://www.warner.senate.gov/public/_cache/files/1/d/1dbcaa3d-f248-478f-8848-d99eb2d07883/3820E710E23C39D23ABCE2782D5C7AA6.6.26.20-letter-to-dhs-final.pdf.

DHS's own Inspector General has highlighted the deficiencies and concerns with ICE's response to COVID-19.[32] Petitioners are exposed to a substantial risk of serious harm at Farmville.

### ii. Respondents Have Disregarded a Substantial Risk of Serious Harm to Petitioners.

The subjective prong of the Eighth Amendment standard requires the plaintiff to establish that the prison or detention official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the detained person's safety, or evidence that detention officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id*. at 837.[33]

Respondents point to the "significant affirmative steps" they have taken to "mitigate the risk of COVID-19" in order to refute Petitioners' deliberate indifference claim. ECF No. 16 at 28; *see also* ECF No. 13 at 19-20. However, Respondents cannot hide the fact that, as medical health experts predicted months ago, there is an uncontrolled outbreak of COVID-19 at Farmville.[34]

---

[32] OIG COVID Report, *supra* note 16.

[33] Following the Supreme Court's decision in *Kingsley v. Henderson*, some circuit courts have extended its reasoning to hold that the standard for claims alleging deliberate indifference to the health or safety of those in pretrial detention under the Fourteenth Amendment should not include a subjective component. *See, e.g.*, *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018), *cert. denied sub nom*. *City of Orange, Cal. v. Gordon*, 139 S. Ct. 794 (2019); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069-70 (9th Cir. 2016) (en banc). Other circuit courts, including the Fourth Circuit, have extended *Kingsley* to other claims as well. *See, e.g.*, *Dilworth v. Adams*, 841 F.3d 246, 248 (4th Cir. 2016) (disciplinary segregation); *Darnell v. Piniero*, 849 F.3d 17 (2d Cir. 2017) (environmental health and safety). In light of *Kingsley*, this Court should hold that a claim of deliberate indifference under the due process clause should be evaluated under an objective standard that requires "more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon*, 888 F.3d at 1125. In any event, Petitioners here meet the higher, subjective standard.

[34] *See also* OIG COVID Report, *supra* note 16 ("the number of detainees who have tested positive for COVID-19 has risen from 220 on April 20, 2020, to 1,312 on May 26, 2020, representing a 496 percent increase in just 4 weeks.").

Respondents again cite to *Toure* in claiming that they have taken "reasonable actions" to protect medically vulnerable individuals at Farmville Detention Center. ECF No. 16 at 29. But the court in *Toure* stated that the petitioners' deliberate-indifference claim "appears to be incorrect because . . . Farmville ha[s], thus far, adequately and successfully protected Plaintiffs. Farmville's success is most apparent, because it has returned no positive COVID-19 tests." *Toure*, 2020 WL 2092639 at *13. At this juncture, that reasoning has plainly been disproven. The facts have changed.

The federal government itself has issued warnings about the particular risk of COVID-19 for those who are elderly or who have certain medical conditions, including those from which Petitioners suffer.[35] ICE is aware of the substantial risk or harm to Petitioners, all of whom have underlying medical conditions that increase their risk of serious illness or death if they contract COVID-19. Yet ICE continues to expose them to take actions (like mass transfers) that all but ensure their exposure to COVID-19, and continues to detain them in a facility where they face a heightened risk. Despite repeated requests from people who are detained, Farmville continues to neglect the urgent medical needs of those in its custody as the number of COVID-19 cases rise. Ex. 2, Quintanilla Gallegos Dec. ¶ 30 (reporting someone pounding on the door for 60-90 minutes asking for help and no one coming); Ex. 7, Perez Garcia Dec. ¶ 15 (reporting begging and screaming to guards for help for 10 minutes). Thus, as the Court recognized in *Helling*, the Constitution "require[s] a remedy" that ensures protection of Petitioners' safety. *Helling*, 509 U.S. at 33. And the only such remedy here is release.

---

[35] *People Who Are at Increased Risk for Severe Illness*, Centers for Disease Control and Prevention (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html.

## V.   Defendants Have Violated Plaintiffs' Rights Under the Rehabilitation Act.[36]

Respondents[37] are defeating and substantially impairing accomplishment of program objectives, discriminating against Petitioners, and failing to provide them reasonable accommodations under Section 504 of the Rehabilitation Act and its implementing regulations. Respondents are legally responsible for all violations of Section 504 committed by their contractors arising from their operation of Detention Facilities. 6 C.F.R. § 15.30(b)(1).

### A.   Respondents are Defeating and Substantially Impairing Programs for Petitioners and Petitioners are Being Denied Access, Benefits of, and Participation in Federally Funded Programs by Respondents Because Of Their Disabilities.

The regulations implementing Section 504 prohibit entities receiving federal financial assistance from, directly or through contracts or licensing, utilizing "criteria or methods of administration the purpose or effect of which would . . . [d]efeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with a disability." 6 CFR § 15.30(b)(4)(ii). Respondents' actions have had the effect of defeating and substantially impairing accomplishment of the objectives of the immigration court, removal proceedings, and detention center programs and activities with respect to Petitioners who have disabilities because they are unable to participate in such programs in any meaningful way while facing an imminent risk of serious illness or death. Petitioners' heightened risk of contracting

---

[36] Should this Court resolve the constitutional questions in Petitioners' favor, it need not reach their claims under the Rehabilitation Act.

[37] Respondent Crawford argues that the Rehabilitation Act does not apply to his facility because it is privately owned and operated. However, the facility receives extensive federal funding, Mallory Noe-Payne, *Documents Show How Farmville, and Va Company, Profit From Detention Center* (Jan. 8, 2020), Radio WVTF, https://www.wvtf.org/post/documents-show-how-farmville-and-va-company-profit-detention-center#stream/0 (stating ICA-Farmville makes about $2 million a month), and is therefore properly subject to the requirements of the Rehabilitation Act. 29 U.S.C. § 794(b)(3) (defining "program or activity" as including "an entire corporation, partnership, or other private organization, or an entire sole proprietorship" or "the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended); *see* Katie Eyer, *Rehabilitation Act Redux*, 23 Yale L. & Pol'y Rev. 271, 282 (2005).

COVID-19 and their lack of access to basic safety eviscerates their ability to pursue immigration relief, complete removal proceedings, and participate in daily activities at Farmville.[38]

Because of their medical conditions, which qualify as disabilities under the Rehabilitation Act,[39] and the active COVID-19 outbreak at Farmville, Petitioners are unable to access the removal process and their immigration court proceedings and the many services, programs, and activities and benefits administered by DHS within the detention center, which receive substantial federal financial assistance. Petitioners' disabilities make them highly vulnerable to complications from COVID-19 that are currently causing them to lose access to such federally funded processes, programs, activities, and benefits. For example, the hospitalization and placement of at least one Petitioner in isolation, Mr. Quintanilla Gallegos, has impeded his access to immigration counsel to develop his immigration case, frustrating his ability to put forward claims for relief in and meaningfully participate in removal proceedings.[40] The other Petitioners, who are also more at risk

---

[38] Although Federal Respondents claim that Petitioners do not meet the causation requirement for a disparate-treatment claim, ECF No. 16 at 30-31, DHS regulations do not impose a strict causation requirement for Rehabilitation Act claims. *See* 6 CFR § 15.30 ("[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from the participation . . . .").

[39] *See* 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102, defining disability as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." Petitioners' conditions substantially limit their ability to breathe, circulate their blood, and fight of infection, among other limitations.

[40] Ex. 2, Quintanilla Gallegos Dec. ¶¶ 25, 28, 34 (being told no when asking to speak to his lawyer when hospitalized and not being able to call his immigration lawyer because he was re-hospitalized); *see also* Ex. 7, Perez Garcia Dec. ¶¶ 20-24 (example of a person detained at Farmville reporting that, while he was in the dorm, being unable to have private calls with his attorney to prepare for trial and calls being cancelled because he was sick and that, while held in an isolation cell, having to argue with the guards to let him call his lawyer, not feeling safe speaking about his asylum claim in front of others without access to a private, confidential call, having no way to make sure no one could hear what he was saying, and barely being able to speak to his attorney because he was in pain); Ex. 1, Warmeling Dec. ¶¶ 26-34 (reporting being unable to communicate with clients detained in Farmville, including a guard making a client hang up the phone during an attorney-client phone call).

of complications, hospitalization, and placement in isolation due to their disabilities, face barriers to accessing counsel and thereby meaningfully participating in the immigration court and removal proceedings programs. Further, Respondents have excluded Petitioners from the many services, programs, and activities and benefits within the detention center because their disabilities make them more at risk of complications or death and they are therefore less able to participate in any of the allowed activities.[41] By continuing to detain Petitioners in a facility where they are more susceptible to complications or death *as a result of their disabilities*, Respondents are exposing Petitioners to a heightened risk of contracting COVID-19 and thereby serious illness and/or death. In these exigent circumstances, Petitioners should not have to wait to face complications or die from COVID-19, when it will be too late, to further demonstrate that, by reason of their disabilities, they have lost access to such federally funded processes, proceedings, services, programs, activities, and benefits. While the basis for Petitioners' detention is not their disability, their access to services, programs, and activities within the detention center and other benefits is directly threatened as a result of their disability.

**B. The Only Reasonable Accommodation for Medically Vulnerable Petitioners Detained at Farmville During an Active COVID-19 Outbreak is Release.**

Respondents dispute that release from detention is a reasonable accommodation under the Rehabilitation Act. ECF No. 16 at 31. However, given the threat of COVID-19 at Farmville and the clear inability to socially distance, the only available "reasonable accommodation" that would mitigate Petitioners' disability is release from detention. Accommodations are considered

---

[41] *See, e.g.*, Ex. 2, Quintanilla Gallegos Dec. ¶ 30 (being held in isolation without access to participate in programs and activities in the dormitory because of his medical condition disability and lacking access to cleaning services and the benefits of a sanitary space, including having to clean his bunk, wipe down his mattress with a rag and some spray, and change the sheets after someone who had been there just before got really sick and was taken to the hospital); *id.* ¶ 35 (reporting knocking on the door and calling for help and no one ever coming).

unreasonable where they impose "undue financial and administrative burdens," *Southeastern Community College v. Davis*, 442 U.S. 397, 412 (1979), or  where "changes, adjustments, or modifications to existing programs that would be substantial, or that would constitute fundamental alterations in the nature of the program," *Alexander v. Choate*, 469 U.S. 287, 301 n.20 (1985) (internal quotations omitted). Here, release would actually alleviate financial and administrative burdens on Respondents and would not require a fundamental alteration in the removal process or the services, programs, and activities of the detention center.

Reasonable accommodations are highly individualized determinations under Section 504. *School Board of Nassau County v. Arline*, 480 U.S. 273, 287 (1987) (individualized inquiry "is essential if 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear"); *Class v. Towson Univ.*, 806 F.3d 236, 247 (4th Cir. 2015) (when evaluating a reasonable accommodation, the dispositive question is whether it was "individualized, reasonably made, and based upon competent medical evidence") (internal citations omitted. The only appropriate reasonable accommodation here, based on individualized facts about Petitioners' situations as medically vulnerable individuals detained at Farmville during an active COVID-19 outbreak, is providing Petitioners the ability to socially distance by releasing them to self-isolate and quarantine. Therefore, Petitioners succeed on their Rehabilitation Act claim.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court grant their Petition and order their immediate release from custody.


Dated: July 13, 2020

Respectfully submitted,

/s/ Adina Appelbaum
Adina Appelbaum, Virginia Bar No. 88974
adina@caircoalition.org
Capital Area Immigrants' Rights (CAIR)
Coalition
1612 K Street NW Suite 204
Washington, DC 20006
(202) 899-1412

Kristin Donovan, Va. Bar No. 92207
kristin@justice4all.org
Granville Warner, Va. Bar. No. 24957
cwarner@justice4all.org
Legal Aid Justice Center
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
(703) 778-3450

Sirine Shebaya*
 sirine@nipnlg.org
Amber Qureshi*
 amber@nipnlg.org
National Immigration Project of the
National Lawyers Guild
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788

 Attorneys for Petitioners-Plaintiffs

* Admitted pro hac vice

31

## <u>CERTIFICATE OF SERVICE</u>

     I, the undersigned, hereby certify that on this date, I uploaded the foregoing PETITIONERS'-PLAINTIFFS' REPLY IN SUPPORT OF THEIR CORRECTED PETITION FOR WRIT OF HABEAS CORPUS AND MANDAMUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF to this Court's CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record.


Dated: July 13, 2020           Respectfully submitted,

                            */s/ Adina Appelbaum*
                            Adina Appelbaum, Virginia Bar No. 88974
                            adina@caircoalition.org
                            Capital Area Immigrants' Rights (CAIR) Coalition
                            1612 K Street NW Suite 204
                            Washington, DC 20006
                            (202) 899-1412

                            *Attorney for Petitioners-Plaintiffs*